WESTWOOD CHEMICAL COMPANY, INC., Plaintiff,

v.

Richard W. KULICK, Arthur F. Fletcher and Lenape Chemicals, Inc., Defendants,

Lester J. Koch, Carol Lynn Koch and Jayne Ellen Koch, as Trustees of the Westwood Chemical Company, Inc., Profit-Sharing Trust, Additional Defendants on Counterclaim.

No. 76 Civ. 4265 (HFW).

United States District Court, S.D. New York.

Aug. 16, 1983.

Arthur I. Winard, P.C., New York City by Arthur I. Winard, Mark L. Rosenfeld, New York City, for Westwood and the additional defendants on the counterclaims.

Stuart, Zavin, Sinnreich & Wasserman, New York City by Harvey Stuart, New York City, for Fletcher, Kulick and Lenape.

## OPINION

WERKER, District Judge.

This action arises out of a dispute between plaintiff Westwood Chemical Company, Inc. ("Westwood") and two of its former employees, defendants Arthur F. Fletcher ("Fletcher") and Richard W. Kulick ("Kulick"). The first cause of action alleged in the amended complaint charges Fletcher and Kulick with conspiring to bring about the termination of an agreement pursuant to which Westwood was retained by Synthetic Products Company ("Synthetic") to act as its exclusive sales representative. The second and third causes of action allege that Fletcher and Kulick breached their fiduciary duties to Westwood by dealing in Westwood accounts for their own benefit, diverting business opportunities from Westwood to themselves and by engaging in outside business activities for their own profit, which resulted in a loss of business income for Westwood. Joined as a codefendant is Lenape Chemicals, Inc. ("Lenape"), a corporation formed by the individual defendants that eventually took over Westwood's account with Synthetic. Fletcher and Kulick, in turn, counterclaim for commissions allegedly owed but not paid to them and for their proper shares in the Westwood Profit-Sharing Trust Fund ("trust fund").

Westwood is a New York corporation having its principal place of business in New York, New York. Fletcher and Kulick are citizens of the State of New Jersey. Lenape is a New Jersey corporation, and its principal place of business is in Bound Brook, New Jersey. Jurisdiction is premised upon 28 U.S.C. § 1332. The matter was tried by the court on June 28, 1983 and June 30, 1983. Following are the court's findings of fact and conclusions of law.

## FACTS

Westwood is engaged in the business of selling and distributing chemical products. On or about August 16, 1972, Westwood entered into a written agreement with Syn-

thetic pursuant to which Westwood was appointed the exclusive sales representative of Synthetic in a specified territory for the sale of various products manufactured by Synthetic. The agreement could be terminated without cause by either party at the end of any contract year after the second contract year by six months written notice. Prior to this time, Westwood had been acting as a sales representative of Synthetic under an oral agreement entered into on or about September 1, 1953.

Fletcher and Kulick were employed by Westwood as salesmen from August 3, 1966 through August 14, 1976 and from October 1, 1972 through August 14, 1976 respectively. At certain times during the course of their employment, the two men received the title of vice president, which title they retained until they left Westwood. Fletcher and Kulick were assigned primarily to the Synthetic account, and, as a result, became aware of the existence and the terms of the agreement between Westwood and Synthetic. They also became aware of a dispute between Westwood and Synthetic regarding a decision made by Synthetic to reduce the amount of the commissions that Synthetic had agreed to pay Westwood and that, at one point in late 1974 or early 1975, Lester J. Koch ("Koch"), Westwood's president, had threatened to take legal action against Synthetic.

As time progressed, both Fletcher and Kulick became unhappy with their employment at Westwood. The main problem was that Fletcher and Kulick wanted an equity interest in the company, an interest they never obtained. Fletcher and Kulick testified that Koch had informed them that it would be possible for them to acquire an ownership interest but that, whenever they subsequently had mentioned the issue to Koch, he just said that it was being worked on. Sometime in 1975, Fletcher and Kulick met with Synthetic representatives and discussed their dissatisfaction with Westwood. After the meeting, Fletcher and Kulick drafted a letter, dated August 7, 1975, to one of the Synthetic representatives and outlined the problems they were having with Koch. In the letter, they mentioned

that several options were open to them, one of which was to take over Westwood's exclusive sales representation of Synthetic and to reimburse Synthetic for certain of the costs of terminating its agreement with Westwood. Thereafter, on or about August 15, 1983, Fletcher and Kulick presented Synthetic with a "Program for a New Sales Agency." The program set out in greater detail the proposal that Fletcher and Kulick had made to Synthetic.

On November 26, 1975, Fletcher and Kulick caused Lenape to be incorporated. On or about December 22, 1975, Synthetic sent Fletcher and Kulick a "second draft" of an exclusive sales representative agreement between Synthetic and Fletcher and Kulick doing business as Lenape. According to the terms of that agreement Lenape was to pay Synthetic 75% of the fee that Synthetic was obligated to pay Westwood upon termination of its agreement with Westwood.

By letter dated January 26, 1976, Synthetic informed Westwood that the agreement between them would be terminated as of August 16, 1976. Fletcher and Kulick notified Koch by letters dated July 26, 1976 that they would be resigning from Westwood effective September 1, 1976. The next day, Koch advised the two men that their employment would be terminated as of August 14, 1976 because of their "faithless and dishonest conduct" and because their "breach of loyalty was the basic cause for the cancellation of [Westwood's] [a]greement with Synthetic." Koch further informed Fletcher and Kulick that, as a result of their "faithless and dishonest conduct," their rights in the company's profit-sharing and pension plans had been forfeited as had been any rights they may have had to certain commissions. Westwood made no contributions to Fletcher's and Kulick's account in the profit-sharing trust fund for the 1976 fiscal year.

Thereafter, Westwood gave a release to Synthetic. The release was executed on September 1, 1976 and apparently was given prior to the institution of any legal proceedings. By virtue of the release, West-

wood gave up any claims against Synthetic relating to the following: (1) the fee that Synthetic was required to pay Westwood upon termination of the agreement between the two companies; (2) the conspiracy between Synthetic and Fletcher and Kulick that resulted in the termination of the agreement; and (3) Synthetic's underpayment of commissions to Westwood. Synthetic paid Westwood $700,000 in exchange for the release.

While they were employed by Westwood, Fletcher and Kulick engaged in various outside activities. For example, in March 1974, Fletcher and his wife incorporated Jener Chemical Company, the business of which was to sell and broker plastics, scrap and general commodity chemicals. From March 6, 1974 through December 31, 1974, Fletcher earned a net income of $26,130 from that company. Fletcher also was a shareholder in Thermal Associated, Inc. ("Thermal") and in a company named Arvin Chemical Corporation. Fletcher received no compensation from either concern. At one time, however, Fletcher agreed to take a reduced salary from Westwood for a period of several months because he had been spending so much time in providing assistance to Thermal. Finally, during the years 1974–1976, Fletcher received $1,300 in commissions from Dublon, Inc. ("Dublon") for helping Dublon find a customer to whom Dublon sold plastic compounds. Dublon was a buyer of Synthetic's products from Westwood.

In October 1973, Kulick caused Karoli Plastics, Inc. ("Karoli") to be incorporated, and, from that date through November 30, 1976, received a net income of $33,115 from the company. Karoli resold vinyl scrap and brokered plastics and chemicals. Kulick also was employed as a sales representative by Kimnet Associates, Inc. ("Kimnet") from July 1974 through August 1975. Kimnet was engaged in the business of reselling plastics. During the above-mentioned period, Kulick earned $12,498 in commissions for his services. From February 1976 through March 1976, Kulick performed consulting services to Hooker Chemical and was paid $3,500.

## DISCUSSION

The court first turns to Westwood's claim that Fletcher and Kulick conspired with Synthetic to terminate its agreement with Westwood. A conspiracy to take away another's customers is an actionable wrong if unlawful means are used or if it is done without just cause. *Duane Jones Co. v. Burke,* 306 N.Y. 172, 190, 117 N.E.2d 237, 246 (1954); 20 N.Y.Jur.2d *Conspiracy—Civil Aspects* § 12 (1982). Moreover, as long as the employment relationship continues, an employee is prohibited from conspiring to take away his employer's customers or to establish a competing business. *Arnold's Ice Cream Co. v. Carlson,* 330 F.Supp. 1185, 1188 (E.D.N.Y.1971); *see Catalogue Serv., Inc. v. Wise,* 63 App.Div.2d 895, 895, 405 N.Y.S.2d 723, 724 (1st Dep't 1978) (per curiam). This is so because such a conspiracy would constitute a breach of the duties of the utmost good faith and loyalty that an employee owes to his employer. *Duane Jones Co. v. Burke,* 306 N.Y. 172, 188, 117 N.E.2d 237, 245 (1954). Applying these principles to the facts of this case, the following appears.

While employed by Westwood, Fletcher and Kulick embarked upon a course of conduct the purpose of which was to divert Synthetic's business from Westwood to themselves for their own gain. They unhesitatingly informed Synthetic of their desire to take over Synthetic's business from Westwood and engaged in substantial negotiations with Synthetic concerning the terms of the transaction. As part of these negotiations, they agreed to share some of the fee that would be incurred by Synthetic upon termination of its agreement with Westwood, which of course facilitated the termination. They also formed Lenape, the corporation that eventually replaced Westwood as Synthetic's sales representative, which corporation received commissions from Synthetic on orders that were placed while Fletcher and Kulick were still em-

ployed by Westwood.[1] This receipt of Synthetic commissions by Lenape indicates that not only did Fletcher and Kulick negotiate the takeover of the Synthetic account while still in Westwood's employ, but that the transaction also was completed during this time. These activities leave no doubt that Fletcher and Kulick violated the rule against conspiring to take away an employer's customer and that they committed egregious breaches of their duties to Westwood.

During the trial, Fletcher and Kulick made much of the commission dispute that Westwood had been having with Synthetic. Even though the relationship between the two companies may have been deteriorating, however, that is no defense or justification for the conduct of Fletcher and Kulick. Both Fletcher and Kulick were aware of the problems between Westwood and Synthetic and therefore were obligated to use their best efforts to retain Synthetic's business for Westwood. *See E.W. Bruno Co. v. Friedberg,* 21 App.Div.2d 336, 340, 250 N.Y. S.2d 187, 191 (1st Dep't 1964). By no means were they entitled, while they were employed by Westwood, to capitalize on the difficulties for their own benefit.

Having determined that Westwood has prevailed on its first cause of action, the court now must determine the amount of its damages. The measure of Westwood's damages is

'the amount of loss sustained by it, including opportunities for profit on the accounts diverted from it through defendants' conduct' . . . or, stated differently, 'the amount which [Westwood]

would have made except for . . . defendant[s'] wrong . . . .'

*McRoberts Protective Agency, Inc. v. Lansdell Protective Agency, Inc.,* 61 App.Div.2d 652, 655, 403 N.Y.S.2d 511, 513 (1st Dep't 1978) (quoting *Duane Jones Co. v. Burke,* 306 N.Y. 172, 192, 117 N.E.2d 237, 247 (1954) & *Santa's Workshop, Inc. v. Sterling,* 2 App. Div.2d 262, 267, 153 N.Y.S.2d 839, 845 (3d Dep't 1956), *aff'd per curiam,* 3 N.Y.2d 757, 143 N.E.2d 529, 163 N.Y.S.2d 986 (1957)); *see E.W. Bruno Co. v. Friedberg,* 21 App. Div.2d 336, 341, 250 N.Y.S.2d 187, 192 (1st Dep't 1964).

The proper method of computing these damages is to estimate the net profits that Westwood would have earned from Synthetic for a reasonable period of time had Fletcher and Kulick not diverted the account to themselves. *McRoberts Protective Agency, Inc. v. Lansdell Protective Agency, Inc.,* 61 App.Div.2d 652, 655–56, 403 N.Y.S.2d 511, 514 (1st Dep't 1978). With respect to the amount of time that the agreement between Westwood and Synthetic reasonably would have been expected to continue, the court finds that, given the decline in the relationship between the two companies and the right of either to terminate the agreement at any time, the most reasonable prediction of the length of time that the agreement would have continued is three years. Westwood's damages accordingly will be computed on that basis.

The parties urge the court to adopt differing means of computing the amount of Westwood's damages, none of which are acceptable to the court.[2] Thus, the court

---

1. Fletcher and Kulick argue that the formation of Lenape during the period of their employment by Westwood was lawful because Lenape sold no Synthetic products until after they had left Westwood. Aside from this argument's obvious misapplication of the law, *see Duane Jones Co. v. Burke,* 306 N.Y. 172, 189, 117 N.E.2d 237, 245–46 (1954), it also runs contrary to the facts. Even if Lenape sold no Synthetic products until after the termination of Fletcher's and Kulick's employment with Westwood, the corporation's receipt of commissions from Synthetic on products sold by Westwood before the termination of their employment was patently wrong.

2. Westwood claims that its damages should be computed solely on the basis of the amount of commissions it earned from Synthetic during the 1975 fiscal year, without regard to overhead. In *McRoberts Protective Agency, Inc. v. Lansdell Protective Agency, Inc.,* 61 App.Div.2d 652, 403 N.Y.S.2d 511 (1st Dep't 1978), however, the court stressed that, in a case such as this, damages must be calculated not on the basis of the total revenues earned from the lost business, but rather by estimating the amount of net profits lost. *Id.* at 655–56, 403 N.Y.S.2d 514. In estimating the net profit figure, account must necessarily be taken of reasonable overhead costs. *342 Holding Corp. v. Car-*

has implemented its own method of calculation which is as follows. To determine the estimated net profits that Westwood would have earned on the Synthetic account, the court has allocated Westwood's net income between its gross commission income from sales of Synthetic products and its gross revenues from the remaining phases of its business. This method of calculation is premised upon the theory that Westwood's expenses were incurred proportionately between Synthetic sales and Westwood's other operations. In effect, overhead has been charged ratably between both aspects of Westwood's business. In order to reach a reasonably accurate figure, the court has made the allocation for each of the last three years of the life of the Synthetic account and has used the average net profit to forecast the amount of net profits that Westwood would have earned from Synthetic in the future.[3]

This procedure produces the following results. Gross commission income from the Synthetic account for the years 1974, 1975 and 1976 was $290,885, $192,653 and $312,450, respectively, for a total of $795,988. Westwood's other income for the same years was $472,539, $296,529 and $135,497 respectively, totaling $904,565. Total income for the three years therefore was $1,700,553, of which approximately 47% ($795,988/$1,700,533) was attributable to Synthetic commission income. Westwood's average net profit for the same three-year period was $27,095 (($66,689 + $31,130 − $16,533) divided by 3). Thus, the amount of Westwood's average yearly net profit attributable to the Synthetic account is 47% (approximately) of $27,095 or $12,682.52. Multiplying this figure by the number of years the agreement reasonably would have continued results in $38,047.56 ($12,682.52 × 3), the net profits that Westwood would have earned but for the conduct of Fletcher and Kulick. *See* Appendix.

■ An unfaithful servant must account to his employer for his secret profits. *Lamdin v. Broadway Surface Advertising Corp.,* 272 N.Y. 133, 138, 5 N.E.2d 66, 67 (1936); *Helmsley-Spear, Inc. v. Winter,* 101 Misc.2d 17, 20, 420 N.Y.S.2d 599, 601 (Sup.Ct. New York County 1979), *modified on other grounds,* 74 App.Div.2d 195, 426 N.Y.S.2d 778 (1st Dep't 1980), *aff'd mem.,* 52 N.Y.2d

---

*lyle Constr. Corp.,* 31 App.Div.2d 605, 606, 295 N.Y.S.2d 248, 250 (1st Dep't 1968) (per curiam); *Roulette Records, Inc. v. Princess Prod. Corp.,* 15 App.Div.2d 335, 338–39, 224 N.Y.S.2d 204, 207–08 (1st Dep't), *aff'd mem.,* 12 N.Y.2d 815, 187 N.E.2d 132, 236 N.Y.S.2d 65 (1962). It is Westwood's position that overhead was absorbed by other aspects of its business. The court, however, finds that, given the percentage of the income that Westwood derived from the Synthetic account, it is incredible that no portion of overhead would have been charged to Synthetic sales. Finally, although Westwood states that the only other expenses were salesmen's salaries, it fails to make any deduction therefor in its calculation of damages, which must be done to reach the net profit figure.

Fletcher and Kulick use a method of comparing what they term gross profits from Synthetic sales with gross profits earned from non-Synthetic sales. The main problem with this calculation is that, in reaching the gross profit figure for Synthetic sales, they have deducted the selling expenses that they have attributed to those sales. A similar deduction, however, has not been made for non-Synthetic sales. The net effect of this method of computation is that the gross profits from Synthetic sales as a percentage of total gross profits is lower than it

should be. And, when the percentage of gross profits from Synthetic sales is multiplied by average net profit per year in order to determine the average net profit attributable to Synthetic sales, the resulting figure is understated.

3. Since lost profits rarely can be predicted with certainty, it is sufficient if the method used to calculate the damages provides a reasonably accurate estimate. *342 Holding Corp. v. Carlyle Constr. Corp.,* 31 App.Div.2d 605, 605, 295 N.Y.S.2d 248, 249 (1st Dep't 1968) (per curiam); *Hughes v. Nationwide Mut. Ins. Co.,* 98 Misc.2d 667, 673, 414 N.Y.S.2d 493, 497 (Sup.Ct. Livingston County 1979). The court recognizes that none of the overhead that Westwood incurred on the sales of its own products should be attributed to its sales of Synthetic products. The court, however, has not been provided with sufficient data to determine the amount of overhead that properly should be attributed to the Synthetic account. *See* note 2 *supra.* Thus, whatever misallocation of overhead to the Synthetic account that results from the court's method of calculation will operate to reduce the amount of the net profits attributable to Synthetic and thereby penalize Westwood for its failure to submit sufficient information.

984, 419 N.E.2d 1078, 438 N.Y.S.2d 79 (1981). Thus, another element of Westwood's damages on the first cause of action is the amount of the commissions that Lenape received from Synthetic on products that were sold while Fletcher and Kulick still were employed by Westwood. Synthetic paid Lenape commissions on these sales if the goods were shipped after August 16, 1976. According to Joint Trial Exhibits Nos. 9 and 10, the amount of these commissions is $12,587.43. Adding this figure to the amount of Westwood's lost profits, the total amount of Westwood's damages on the first cause of action is $50,-634.99.

■ Fletcher and Kulick contend that, as a result of the release that Westwood gave to Synthetic, Westwood's recovery on the first cause of action must be reduced in accordance with the provisions of section 15–108(a) of the New York General Obligations Law. N.Y.Gen.Obl.Law § 15–108(a) (McKinney 1978). Section 15–108(a) provides in part as follows:

> When a release . . . is given to one of two or more persons liable or claimed to be liable in tort for the same injury, . . . it does not discharge any of the other tortfeasors from liability for the injury . . . unless its terms expressly so provide, but it reduces the claim of the releasor against the other tortfeasors to the extent of any amount stipulated by the release . . ., or in the amount of the consideration paid for it, or in the amount of the released tortfeasor's equitable share of the damages under article fourteen of the civil practice law and rules, whichever is the greatest.

*Id.*

The statute applies to a release given to a person "liable or claimed to be liable." The issue that arises in this case is whether the statute applies because no action ever was brought against Synthetic. While the court has found no authority precisely on point, a review of the statute's history and the rele-

vant case law indicates that, if faced with the question, the courts of New York would hold that section 15–108(a) does apply. The purpose of section 15–108 is to encourage settlements. 12th Ann.Rep. [1974] McKinney's Sess. Laws 1791, 1817. A prelitigation settlement is one of the most inexpensive means of resolving disputes and therefore should be encouraged as a matter of public policy. Thus, to effectuate the purpose of the statute, section 15–108(a) should be construed as being applicable regardless of whether a complaint has been filed. Such a construction also would prevent injured persons who settle before commencing legal proceedings from obtaining a windfall recovery. *See Bartlett v. General Elec. Co.,* 90 App.Div.2d 183, 457 N.Y.S.2d 628 (3d Dep't 1982); *Purcell v. Doherty,* 102 Misc.2d 1049, 424 N.Y.S.2d 991 (Sup.Ct. Bronx County 1980).[4]

■ According to the statute, the releasor's claim is to be reduced by the greater of the released person's equitable share of liability or the amount paid for the release. In this case, Westwood's damages are less than the amount paid by Synthetic for the release. The problem with reducing Westwood's damages by the amount of the release, however, is that the court has not been shown what amount Synthetic paid Westwood for a release of any potential conspiracy claim. In *Retzel v. State,* 94 Misc.2d 562, 405 N.Y.S.2d 391 (Ct.Cl.1978), the court held that the burden is on the releasor to prove what part of the release money is allocable to the subject claim, and that, if the releasor fails to do so, all of the monies paid for the release will be applied to reduce the damages. *Id.* at 572, 405 N.Y.S.2d at 398. The court's reasoning was based on the inability of the defendant who was not a party to the release to control the terms of the release. *Id.* Since Westwood has not satisfied that burden, its damages must be reduced by the total amount paid by Synthetic for the release, which, of course, results in no recovery.

---

**4.** This conclusion in no way conflicts with *Franzek v. Calspan Corp.,* 78 App.Div.2d 134, 434 N.Y.S.2d 288 (4th Dep't 1980), wherein the court held that "preaccident releases," which generally are disfavored in the law, are not covered by section 15–108.

The court next turns to the second and third causes of action, which charge Fletcher and Kulick with breaching their fiduciary duties to Westwood. The proof adduced at trial on these claims focussed solely on the outside activities of Fletcher and Kulick referred to in the court's statement of the facts of the case.[5] Although Fletcher and Kulick were hired by Westwood to work an eight-hour day, five days per week, there is little indication in the evidence that Westwood ever specifically prohibited them from pursuing outside business interests. As mentioned in the court's discussion of the first cause of action, Fletcher's and Kulick's employment with Westwood imposed upon them the duties of good faith and fair dealing. *Duane Jones Co. v. Burke,* 306 N.Y. 172, 188, 117 N.E.2d 237, 245 (1954). In order to find that Fletcher and Kulick breached these duties by pursuing outside interests, however, there must be a showing that they either decreased the work they did for Westwood while engaging in these activities, misappropriated some special knowledge that they gained from their employment with Westwood, *see Feiger v. Iral Jewelry, Ltd.,* 41 N.Y.2d 928, 363 N.E.2d 350, 394 N.Y.S.2d 626 (1977) (per curiam), or somehow competed with Westwood in carrying out these activities.

The evidence is at best sketchy on the question whether the work done by Fletcher and Kulick for Westwood declined as a result of their outside business pursuits. Nor is there any proof that they misappropriated any special knowledge acquired from Westwood. And, although they may have sold products to customers of Westwood, the evidence does not sufficiently establish that Westwood also had offered or sold the same products to these customers. In other words, there is no adequate proof that, in engaging in any of these outside activities, Fletcher and Kulick were competing with Westwood. The court must therefore conclude that neither Fletcher nor Kulick breached any fiduciary duty to Westwood in conducting these outside business activities.

The remaining elements to be resolved are the counterclaims asserted by Fletcher and Kulick. In the first counterclaim, Fletcher and Kulick contend that Westwood owes them commissions on sales that they made of Synthetic products from September 1, 1975 through August 16, 1976. The second counterclaim alleges that Westwood withheld from Kulick commissions that he had earned from September 1, 1974 through August 31, 1975 in order to recoup certain contributions that Westwood had made to the profit-sharing trust fund for Kulick's account. The third counterclaim seeks to recover commissions that Fletcher and Kulick had earned on sales of Synthetic products for which Westwood received commissions from Synthetic immediately after the termination of its agreement with Synthetic. On the fourth counterclaim, the following is alleged: (1) that, during the 1967 through 1976 fiscal years, Westwood failed to make proper contributions to Fletcher's and Kulick's account in the profit-sharing trust fund; (2) that Westwood failed to pay Fletcher and Kulick what they had earned on Westwood's actual contributions to the trust fund; and (3) that, on the basis of the commissions to which Fletcher and Kulick claim they are entitled on the second and third counterclaims, Fletcher and Kulick are entitled to receive additional monies from the trust fund.

Westwood argues that Fletcher and Kulick forfeited their rights to the monies sought on the counterclaims because of their dealings with Synthetic. Under New York law, a faithless or disloyal employee forfeits his right to compensation for services performed during the period of his disloyalty. *Feiger v. Iral Jewelry, Ltd.,* 41 N.Y.2d 928, 363 N.E.2d 350, 394 N.Y.S.2d 626 (1977) (per curiam); *Helmsley-Spear, Inc. v. Winter,* 101 Misc.2d 17, 20, 420 N.Y. S.2d 599, 601 (Sup.Ct. New York County 1979), *modified on other grounds,* 74 App. Div.2d 195, 426 N.Y.S.2d 778 (1st Dep't

---

**5.** As noted above, the second and third causes of action as set forth in the amended complaint refer to various other allegedly illegal activities of Fletcher and Kulick.

1980), *aff'd mem.,* 52 N.Y.2d 984, 419 N.E.2d 1078, 438 N.Y.S.2d 79 (1981); *Herman v. Branch Motor Express Co.,* 67 Misc.2d 444, 446, 323 N.Y.S.2d 794, 796 (New York City Civ.Ct.1971). It matters not that the services were beneficial to the employer or that the compensation is in the form of commissions. *Feiger v. Iral Jewelry, Ltd.,* 41 N.Y.2d 928, 363 N.E.2d 350, 394 N.Y.S.2d 626 (1977) (per curiam).

▮ Having found that, with respect to their dealings with Synthetic, Fletcher and Kulick were unfaithful to Westwood, the court must follow these precedents and conclude that Fletcher and Kulick have forfeited any commissions that they may have earned during the period of their dishonesty. Therefore, they are not entitled to any of the commissions sought on the first and third counterclaims. The second counterclaim, however, is for commissions earned by Kulick from September 1, 1974 through August 31, 1975. Since there has been no adequate showing that Kulick acted faithlessly during this time period, Westwood must pay to Kulick $2,700, the agreed upon amount of these commissions. *See Herman v. Branch Motor Express Co.,* 67 Misc.2d 444, 446, 323 N.Y.S.2d 794, 796 (New York City Civ.Ct.1971).

The fourth counterclaim is not as easily resolved. Westwood's assertion that Fletcher and Kulick forfeited their rights to any monies in the profit-sharing trust fund by virtue of their faithless conduct fails to take into account the provisions of section 203 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1053.[6] Section 1053 severely circumscribes the permissibility of forfeiture of an employee's accrued benefit in a plan and provides that

> an employee who has at least 10 years of service has a nonforfeitable right to 100 percent of his accrued benefit derived from employer contributions.

29 U.S.C. § 1053(a)(2)(A). Section 1053 also contains a graduated minimum vesting schedule, 29 U.S.C. § 1053(a)(2)(B), and a minimum vesting formula based upon an employee's age and years of service. 29 U.S.C. § 1053(a)(2)(C). To pass muster under ERISA, a plan must satisfy one of these three alternate vesting schedules.

▮ In this case, Westwood's profit-sharing plan, which was fully funded by Westwood, provided that an employee who left the company for any reason other than retirement, disability or death and who had more than five years of service was entitled to receive 100% of his share in the trust fund. Westwood Profit-Sharing Plan Art. X. The plan's vesting provisions therefore were more liberal than those of section 1053. The plan, however, also contained a forfeiture clause, which stated:

> If the COMPANY terminates employment of a participating employee because of his faithless conduct, he shall forfeit all rights to receive any portion of the corpus or income of this trust.

*Id.* at Art. X ¶ C. The plan defined the term "faithless conduct" as meaning "dishonesty, theft, embezzlement or the commission of acts of sabotage or malicious mischief to the COMPANY." *Id.* at Art. II ¶ 13.[7]

By its terms, the forfeiture clause applies to any employee without regard to age or

---

6. Westwood argues that ERISA became applicable to its profit sharing plan only as of the plan year beginning September 1, 1976 and thus is not controlling in this case. It has been held, however, that the nonforfeiture provisions of ERISA apply to any employee who was employed on January 1, 1976. *E.g., Cohen v. Martin's,* 694 F.2d 296 (2d Cir.1982) (per curiam); *Fremont v. McGraw-Edison Co.,* 606 F.2d 752 (7th Cir.1979), cert. denied, 445 U.S. 951, 100 S.Ct. 1599, 63 L.Ed.2d 786 (1980). Since both Fletcher and Kulick were employed by Westwood on that date, section 1053 is therefore applicable.

7. Westwood's profit-sharing plan was amended in 1963. One of the amendments deleted the word "disloyalty" from the original plan's definition of "faithless conduct." Fletcher and Kulick contend that, as a result of this amendment, the forfeiture of their plan benefits was improper apparently because their conduct could only be described as disloyal. The court disagrees. The decision to forfeit the interests of Fletcher and Kulick reasonably could have been based upon a determination that, at the very least, they had acted dishonestly.

years of service, and it therefore appears to conflict with section 1053. Yet, in the case of an employee who did not meet the minimum vesting requirements of the statute, the clause seemingly is valid. The facts of this case illustrate the overbreadth of the clause. Fletcher had been working for Westwood for over ten years when his rights in the trust fund were forfeited—a clear violation of section 1053(a)(2)(A). Kulick, on the other hand, had been employed for less than four years and therefore had no nonforfeitable rights under the statute. The court is thus called upon to determine whether the forfeiture clause should be declared void in toto or merely voidable when improperly applied. Although the issue apparently has not arisen in this circuit, it has been addressed by other courts.

To begin with, it has been held that forfeiture clauses are valid where the only interests that are affected are those that are not vested under section 1053. *Hummell v. S.E. Rykoff & Co.*, 634 F.2d 446 (9th Cir.1980); *Hepple v. Roberts & Dybdahl, Inc.*, 622 F.2d 962 (8th Cir.1980); *Fremont v. McGraw-Edison Co.*, 606 F.2d 752 (7th Cir.1979), *cert. denied*, 445 U.S. 951, 100 S.Ct. 1599, 63 L.Ed.2d 786 (1980); *Nedrow v. MacFarlane & Hays Co. Employees' Profit Sharing Plan & Trust*, 476 F.Supp. 934 (E.D.Mich.1979); *see* 26 C.F.R. § 1.411(a)–4(a). In cases where the forfeiture clause is not expressly limited to employees whose rights may not be forfeited under section 1053 and thus is susceptible to both valid and invalid applications, courts have adjusted the clause, where reasonably possible, to make it compatible with section 1053. In other words, these courts have not voided the clause but have construed it to apply only where permissible under the statute. *Hummell v. S.E. Rykoff & Co.*, 634 F.2d 446 (9th Cir.1980); *Nedrow v. MacFarlane & Hays Co. Employees' Profit Sharing Plan & Trust*, 476 F.Supp. 934 (E.D.Mich.1979).

In *Hummell v. S.E. Rykoff & Co.*, 634 F.2d 446 (9th Cir.1980), the plan in question had a forfeiture clause that applied to plan participants who had been employed for less than fifteen years and who had gone to work for a competitor. *Id.* at 448. The clause did not provide for total forfeiture but instead contained a schedule, based upon years of service, of percentages that a participant would forfeit upon engaging in competitive work. *Id.* The plaintiff had terminated his employment of eleven years to work for a competitor, and, under the percentage schedule of the forfeiture clause, forfeited 40% of his interest in the plan. *Id.*

The *Hummell* court first determined that ERISA does not prohibit forfeitures of rights that are in excess of the minimum vesting requirements of section 1053. *Id.* at 449–51. The plan, however, permitted forfeitures of benefits of employees with ten or more years of service and thus could be improperly applied—as had happened in the plaintiff's case. The court concluded that, if possible, the plan should be interpreted in such a way as to make it legal. *Id.* at 452. The court therefore altered the clause to make it applicable only to participants with less than ten years of employment. *Id.* Since the plaintiff had had eleven years of service, the court awarded him 100% of his interest in the plan. *Id.* In *Nedrow v. MacFarlane & Hays Co. Employees' Profit Sharing Plan & Trust*, 476 F.Supp. 934 (E.D.Mich.1979), the court employed a similar procedure.

The court accepts this reasoning and, accordingly, finds that the forfeiture clause of Westwood's profit-sharing plan is valid but only if read as applying to employees with less than ten years of service. Since Fletcher had been employed for more than ten years, he is not subject to the forfeiture clause. Fletcher therefore is entitled to recover 100% of his interest in the trust fund. Although Joint Trial Exhibit No. 26 states that this sum equals $33,540.85, this figure does not reflect the $2,700 that Westwood was required to contribute to Fletcher's account for the 1976 fiscal year. Since the $2,700 also is nonforfeitable under section 1053, Fletcher may recover $36,-240.85, the amount of Fletcher's vested in-

terest in the trust fund.[8] Kulick, however, had less than ten years of service and was subject to the forfeiture clause. All of his rights in the trust fund therefore properly were forfeited because of his faithless conduct.

## CONCLUSION

In accordance with the above, although Westwood has prevailed on the first cause of action, it is entitled to no damages on that claim. Nor may it recover any damages on the remaining causes of action contained in the amended complaint. Kulick may recover the sum of $2,700 on the second counterclaim and Fletcher is entitled to recover $36,240.85 on the fourth counterclaim. Fletcher and Kulick are directed to submit a judgment on notice within ten (10) days of the entry of this order.

SO ORDERED.

## APPENDIX *

### GROSS INCOME FOR THE 1974, 1975 and 1976 FISCAL YEARS

|  | 1974 | 1975 | 1976 | Total |
|---|---|---|---|---|
| Synthetic Income | $290,885 | $192,653 | $312,450 | $795,988 |
| Other Income ** | $472,539 | $296,529 | $135,497 | $904,565 |
| Gross Income | $763,424 | $489,182 | $447,947 | $1,700,553 |

### PERCENTAGE OF SYNTHETIC INCOME AND OTHER INCOME TO TOTAL INCOME

$$\frac{\text{Commission Income}}{\text{Total Income}} = \frac{\$795,988}{\$1,700,553} = .468076$$

$$\frac{\text{Other Income}}{\text{Total Income}} = \frac{\$904,565}{\$1,700,553} = \frac{.531924}{1.00}$$

### AVERAGE NET PROFIT

| Year | Net Profit/Loss | Average Per Year |
|---|---|---|
| 1974 | $66,689 | |
| 1975 | $31,130 | $81,286 = $27,095 |
| 1976 | $16,533(loss) | 3 |

### PERCENTAGE OF AVERAGE NET PROFIT ATTRIBUTABLE TO SYNTHETIC AND OTHER INCOME

| | | | | |
|---|---|---|---|---|
| Synthetic Income | $27,095 | x .468076 | = | $12,682.52 |
| Other Income | $27,095 | x .531924 | = | $14,412.48 |
| Total | | | | $27,095 |

### NET PROFITS THAT WOULD HAVE BEEN EARNED FROM SYNTHETIC ACCOUNT

$12,682.52 x 3 = $38,047.56

---

* All figures are based upon Joint Trial Exhibit 16A–C

**Other Income

8. Fletcher's contention that Westwood improperly failed to take into account his commissions when computing the amount of its annual contributions to his account in the trust fund is without merit. According to the provisions of Westwood's profit-sharing plan, Westwood's annual contributions to the trust fund were to be made on the basis of a percentage of a participating employee's compensation for the year. Westwood Profit-Sharing Plan Art. III. The plan's definition of the term "compensation" specifically excluded commissions and bonuses. *Id.* at Art. II ¶ 12. Thus, Westwood's contributions to Fletcher's account properly were made solely on the basis of his annual base salary, without regard to his commission income.

| | 1974 | 1975 | 1976 |
|---|---|---|---|
| Operating Income | $470,537 | $282,587 | $135,353 |
| Interest Income | 2,002 | 6,919 | 144 |
| Reduction in Bad Debt | —— | 7,023 | —— |
| | $472,539 | $296,529 | $135,497 |