Arthur **CHAMBLESS** and Mildred H. **Chambless**, Plaintiffs,

v.

**MASTERS, MATES & PILOTS PENSION PLAN, et al.,** Defendants.

No. 80 Civ. 4258 (RLC).

United States District Court, S.D. New York.

Aug. 2, 1984.

Wisehart & Koch, New York City, for plaintiffs; Arthur M. Wisehart, New York City, of counsel.

Proskauer, Rose, Goetz & Mendelsohn, New York City, for MM & P Pension Plan, Maher, MM & P Pension Plan Trustees and Maritime Service Committee; Bettina B. Plevan, Eileen Reinhardt, New York City, of counsel.

Burton M. Epstein, New York City, for International Organization of Masters, Mates and Pilots.

## OPINION

ROBERT L. CARTER, District Judge.

*Background Facts*

Plaintiff, Albert Chambless, became a member of the International Organization of Masters, Mates & Pilots ("MM & P") in 1944 after being issued a third mate's license. He is a resident of Alabama and received all of his MM & P work assignments through the union hiring hall in Mobile, Alabama. He obtained his master's license in 1956, and his first assignment as a master in August, 1966, when he was given command of the Frontenac Victory. This assignment lasted until May, 1968. Thereafter, Chambless regularly hired out as master or chief mate through 1975.

The MM & P pension plan ("plan") was established in 1955. It is an employer-funded pension and trust fund that provides retirement benefits for MM & P licensed deck officers. The plan is administered by an equal number of employee and employer designated trustees who have broad powers to formulate regulations for the administration of the plan. The trustees have delegated the day to day operation of the plan to an administrator. Stephen Maher, now Executive Director of the plan, functioned as administrator from 1965–1981. The administrator decides initially whether an applicant satisfies the plan's eligibility requirements and determines the appropriate pension benefit the applicant is entitled to receive. His decisions are presented to the trustees for approval. The administrator's determination that an applicant is not entitled to benefits does not reach the trustees unless the applicant appeals, in which case the trustees then determine whether to uphold or reject the administrator's determination.

The trustees have formulated a large body of regulations governing the plan's operations. Prior to the enactment of ERISA, 29 U.S.C. § 1001 *et seq.*, the plan's regulations provided for normal retirement without regard to age, after 20 years of pension service credits. Pursuant to the terms of the 1966 collective bargaining agreement, the plan was amended to provide for wage related pension benefits based on the average salary for the five highest salary years in the last ten years prior to the effective date of retirement.

Prior to August, 1976, retirement was defined in Article II, Section 13a of the plan regulations as complete withdrawal from "further employment in any capacity in the maritime industry", except that the trustees "in their sole discretion could permit [a retiree to work] in shoreside positions covered by a collective bargaining agreement by the [union], and upon application submitted through the [union], [to work] as a marine surveyor or employment aboard fishing vessels, yachts and other small craft (such as supply boats) provided employment [is] in a capacity, not covered by the collective bargaining agreements of the [union]."

Article II, Section 13(b) provided that if a retiree worked in employment forbidden by Section 13a, he forfeited his pension benefits for the month he worked and for six

additional months. He had to return all benefits received and if he failed or refused to do so, all future benefits could be denied. The retiree had to notify the trustees in writing within 15 days of the commencement of forbidden employment, and the trustees were empowered to disqualify him permanently from receiving any future pension benefits if he failed to do so.

In December, 1975 the plan adopted Amendment 42 which added a new Section 13 to Article II. Normal retirement age was defined as "age 65, or, if later, the age of the participant on the tenth anniversary of his participation. All references to 'Normal Pension' [were] changed to read 'Regular Pension' ".

In 1976, Walter Anderson, who was in charge of the hiring hall in Mobile, Alabama, sought to induce Chambless to retire in accord with then current union policy. Anderson advised Chambless that the union wanted all the older licensed deck officers to retire and that if Chambless did not retire, he could expect to be shipped out on second or third mate assignments. During 1976 and 1977 all of Chambless' assignments through the Mobile, Alabama hiring hall were in second or third mate jobs. In a letter dated March 17, 1979, sent to all offshore ports, Robert Lowen, Union President, discussed the union's effort to secure non-wage related benefits and other incentives to induce older deck officers to retire.

Chambless apparently succumbed to the pressure and filed an application for retirement benefits on November 12, 1976, but then, having second thoughts, withdrew the application. On April 2, 1977, he filed a second application. At that time he was advised that his retirement benefits would be approximately $920 per month. This calculation was presumably based on his 33¼ years of pension service credits as of April 2, 1977, and his average salary for his five highest salary years between 1967 and 1977, which appear to be 1970–1975 when he sailed two times as master (6/10/73–9/30/74, Hess Petrol; 7/1/75–11/24/75, Greenport) and five times as chief mate (1/1/70–2/11/70, Spirit of Liberty;

5/25/70–1/1/71, Golden Gate; 8/6/71–3/31/73, Hess Voyager; 4/9/73–6/9/73, Hess Petrol; 2/14/75–4/10/75, Hess Refiner).

Prior to filing his application, Chambless had accepted employment as a master (3/18/77–4/1/77) on the Mission Viking, a vessel owned by a company not a party to a collective bargaining agreement with MM & P. He testified that before accepting this assignment, he had spoken to the dispatcher at the union hiring hall in Mobile, Alabama and was advised that there would be no problem. Two days after the filing of his April 2, 1977 application, he accepted assignment as master on the Mount Explorer, another non-MM & P contract vessel. That assignment did not end until September 13, 1977. The Mission Viking was an oil drilling rig. The Mount Explorer was a U.S. flag ocean going vessel.

On August 24, 1976, the trustees adopted amendments 46 and 47 as new plan regulations. These amendments were proposed by union designated trustees and drafted by union counsel who advised the trustees that the two proposals were not at odds with any ERISA provision. Amendment 46 provides that retirees working in forbidden employment are not entitled to any pension benefits during such employment and for six months thereafter, provided the six month penalty does not extend beyond the retiree's normal retirement age. Moreover, if a retiree works as a licensed deck officer on a U.S. flag ocean going vessel owned by a company not participating in the MM & P plan, the retiree forfeits his pension benefits until normal retirement. Amendment 47 provides that an active member (i.e. one not yet retired) who, subsequent to acquiring 10 years of vesting service, works as a licensed deck officer on a United States flag ocean going vessel for a company not under contract with MM & P, shall not be entitled to any pension benefits until normal retirement age.

The two new amendments were discussed in articles by Robert Lowen, then MM & P Secretary Treasurer and Stephen Maher, plan administrator, published in the

October, 1976 issue of the MM & P newspaper, *The Pilot.* Lowen's article called attention to the regulations' ban on prohibited employment. Maher's article highlighted the same theme in a short explanation of the amendments' meaning, and his article carried the full text of the two provisions. In a later article published in the December, 1976 issue of the newspaper, Maher again focused on the two regulations and discussed their importance.

Copies of the newspaper, distributed at union hiring halls in various ports from which the union operates, are not mailed to union members or pension participants. Booklets concerning the pension plan and explaining the regulations are sent to plan participants but the texts of neither the regulations or amendments were sent directly to union members. The first communication directly to the plan participants about Amendment 47 is a letter from Maher dated March 13, 1978, which states in pertinent part:

> Further, subsequent to accruing ten (10) years of vesting service credit and prior to retirement, if you work as a Licensed Deck Officer aboard U.S. flag ocean going vessels which are operated by a company which is not a participant in an MM & P Pension Plan (excluding civilian employment with the Military Sealift Command or another government entity) you will not be entitled to any pension benefits prior to reaching Normal Retirement Age (Normal Retirement Age means age 65 or, if after, the age of the participant on the tenth (10th) anniversary of his participation).
>
> An excerpt of the Pension Regulations pertaining to vested pension credit is attached.
>
> I urge you to read the attached language carefully, as violation of the Rules will affect payment of your pension benefit, as well as, any survivor's options.

Plaintiff's Ex. 38.

On July 19, 1977, Maher wrote asking Chambless to confirm or deny that he was working as a licensed deck officer on a ship not under MM & P contract. Defendants'

Ex. M. Chambless replied in an undated letter confirming that he had accepted employment aboard a non-MM & P vessel and inquired whether his pension would be "payable as soon as he ceases such employment and withdraws completely from employment aboard a vessel." There is no direct reply to this latter inquiry in the record.

Chambless was subsequently advised by Maher that his pension application had been denied and that because of his acceptance of employment as a licensed deck officer with a company not under contract with MM & P, he had forfeited all rights to pension benefits until age 65. He was further advised that his estimated pension benefits at age 65 would be $470 per month, not the $920 figure previously given to him. Chambless appealed to the trustees who ratified the decision of the administrator.

### The Claims Involved

Plaintiffs (Chambless and his wife) instituted the instant action in 1980 making a wide variety of claims including antitrust infractions by the shipping companies, breach of the duty of fair representation by the union, breach of fiduciary duties as well as a variety of other ERISA violations by the plan and its trustees, and the infliction of emotional distress on both plaintiffs by the union and plan trustees. Both compensatory and punitive damages were sought. Early on in the litigation all claims against the trustees in their individual capacities were dismissed, and the litigation proceeded against the trustees in their official capacities only.

Many of the claims were dismissed when the court granted partial summary judgment for defendants in an opinion reported at 571 F.Supp. 1430 (1983), with which familiarity is assumed. At trial a jury was empanelled to consider the claims for breach of the duty of fair representation, for emotional distress, and for compensatory and punitive damages against the union and the trustees. At the close of the plaintiffs' case those claims were taken from the jury and dismissed by the court, apply-

ing the standard enunciated in *Simblest v. Maynard*, 427 F.2d 1, 4 (2d Cir.1970) and cognate cases, *see e.g. Mattivi v. South African Marine Corp., "Huguenot"*, 618 F.2d 163, 167 (2d Cir.1980).

This resulted in the dismissal of all claims against the union and all claims concerning Mrs. Chambless, leaving Chambless as the sole plaintiff in the case. What remained to be decided was whether the forfeiture of Chambless' pension benefits until age 65 by the plan trustees was arbitrary and capricious. Since that matter was an issue for court determination, the jury was dismissed and the trial proceeded to the court. Subsequent to the conclusion of the trial, the parties submitted post-trial proposed findings of fact and memoranda of law.

*Determination*

■ Chambless claims that the suspension of his pension until age 65 violates Section 203 of ERISA, 29 U.S.C. § 1053(a). Prior to December, 1975, a plan participant was entitled to what was described as a normal pension after 20 years of pension service credits. Age was not a factor. The regulations were changed in December, 1975 to conform to ERISA language, 29 U.S.C. § 1053(a), prohibiting all vested pension benefits from forfeiture at normal retirement age. The statute defines normal retirement age as 65 years of age, or if later, the 10th anniversary of a participant's participation in the plan. Amendment 42 to the plan regulations tracks this statutory language. It is clear that ERISA imposes no obligation to pay retirement benefits to a plan participant before he reaches age 65. *Fine v. Semet*, 699 F.2d 1091, 1093 (11th Cir.1983). *Riley v. MEBA Pension Trust (Riley II)*, 452 F.Supp. 117, 120 (S.D.N.Y.) (MacMahon, J.), *aff'd* 586 F.2d 968, 970 (2d Cir.1978); *Hurn v. Retirement Fund Trust*, 648 F.2d 1252, 1253–54 (9th Cir.1981). *See also Morse v. Stanley*, 732 F.2d 1139, 1144 (2d Cir.1984) ("Considering that ... the plaintiffs ... will each receive their vested benefits with interest upon reaching their normal retirement age (65), their contention that the

trustees acted arbitrarily or in bad faith in denying them accelerated benefits is without merit"). Moreover, where the trustees act within the law their determinations may be disturbed by court order only on a showing of bad faith, caprice or arbitrariness. *Riley v. MEBA Pension Trust (Riley I)*, 570 F.2d 406, 410 (2d Cir.1977); *Fine v. Semet, supra; Baylés v. Central States, Southeast and Southwest Areas Pension Fund*, 602 F.2d 97 (5th Cir.1979).

■ The trustees are required to provide plan participants with a summary plan description which sets forth circumstances which may result in disqualification, ineligibility, denial or loss of benefits. 29 U.S.C. § 1022(a)(1), (2), (b). Neither the administrator nor the trustees complied with this requirement before forfeiting Chambless' benefits. The record discloses that Amendment 47 to the regulations, pursuant to which Chambless' application was denied and he was held to have forfeited his right to a pension until age 65, was adopted in August, 1976. The amendment was discussed in articles by Lowen and Maher in the October, 1976 issue of the union newspaper. In Maher's column the text of the amendment was set out in full. The matter was again discussed in another article by Maher in the December, 1976 issue of the union newspaper. As I understand it the newspaper is distributed in quantity at various union hiring halls at offshore ports. Chambless says he never saw the articles. There is testimony that about 200 copies of the October issue of the MM & P newspaper would normally be sent to Mobile arriving about the first two weeks of November. The copies are stacked on a table in the hall. A secretary in the Mobile office testified by deposition that Chambless had knowledge of Amendment 47 before filing his application. She states that she discussed the matter thoroughly with him and that she wrote the plan office for information on the amount Chambless was expected to receive in pension benefits when he retired. (Dep. Mary Smith at 118). I do not credit the testimony that Chambless and the secretary discussed Amendment 47

thoroughly. Amendment 47 had no conceivable impact on Smith sufficient to stimulate her interest in the provisions to the point that she would be able to discuss it thoroughly with anybody. In any event, it is the trustees' responsibility to get the necessary information to the participants. Chambless' vicarious receipt of this knowledge through third parties not connected with the plan does not suffice. Moreover, while it is clear from Chambless' response to Maher's inquiry about engaging in forbidden employment that he knew that he would be barred from receiving any pension until he had actually retired, I am satisfied that he did not understand the impact which Amendment 47 would have on his pension rights.

There is no evidence of any act by the plan or union to clarify that impact for participants. What was published in the various articles was the simple message that forbidden employment would result in forfeiture of the right to retirement benefits until age 65. Neither the articles in the October and December issue of the newspaper nor even the letter sent to all participants dated 13 March 1978 explained the full import of the forfeiture of the right to benefits until age 65 to a participant such as Chambless with 32¼ years of pension service credits. The forfeiture until age 65 brought into play an additional factor not mentioned in any of these statements concerning the amendment. A wage related pension benefit provision accords a participant the right to have his benefits based on the average of his highest salary for five of his last ten years before retirement during which he earned the most. Denying Chambless the right to a pension until age 65 meant not only that his pension was postponed, but since the ten years preceeding the year in which he turns age 65, 1976–1986, cover a period in which he will earn nothing on MM & P jobs, the wage related formula pursuant to which he would have obtained a generous pension would not apply. His benefits would be determined under a different formula which results in reducing his benefits to roughly half of what he would have re-ceived in 1977 based on a wage related formula.

While the court does not believe the trustees willfully withheld information from Chambless or other participants as to the effective reach and full import of Amendment 47, the statutory requirement of full disclosure has no meaning in this context unless the trustees are required to advise participants fully of what effect a new regulation will have before they can penalize a participant for violating the regulation. Defendants contend at trial that Chambless knew, or should have been able to figure out by taking into account the wage related provision, the effect forfeiture until age 65 would have on his pension benefits. It is not all that obvious, however, and it seems to me inequitable to enforce the new provision without first having its full effect explained to all participants. In my judgment, therefore, the trustees were barred in 1977 from applying Amendment 47 to Chambless before first explaining all of its implications to him. It is clear enough that Chambless believed he might be denied his pension for the period he continued to work. He was not aware, however, that by taking a non-MM & P assignment he had forfeited his rights to a pension until age 65 and moreover that the forfeiture carried an added penalty of halving the benefits he had been advised he would receive.

Amendment 47 is arbitrary and capricious in any event. In *Riley v. MEBA Trust Fund (Riley I), supra* at 413, the Second Circuit stated that "new federal standards of fairness must apply with respect to charges of breach of fiduciary duty not explicitly covered by Part 4 of ERISA", but concluded that it knew of no applicable federal standard other than the arbitrary or capricious yardstick. Suspension of benefits until age 65 is, of course, permissible. *Sutton v. Weirton Steel Division of National Steel Corp.*, 724 F.2d 406, 410 (4th Cir.1983), *cert. denied*, —— U.S. ——, 104 S.Ct. 2387, 81 L.Ed.2d 345 (1984); *Hurn v. Retirement Fund Trust of*

the Plumbing, Heating and Piping Industry of Southern California, 460 F.Supp. 112 (C.D.Ca.1978), aff'd, 648 F.2d 1252 (9th Cir.1981). However, the right to suspend benefits until age 65 is of no comfort to defendants. They have not only suspended Chambless' rights to benefits until age 65 but have confiscated a considerable part of those benefits. While the cases allow suspension, none has approved a formula where the suspension results in greatly reduced benefits. Indeed, in Morse v. Stanley, supra, the court was satisfied that all of plaintiffs' accrued benefits would be received, with interest, when they reached age 65 and explicitly cited this factor in setting forth its reasons for allowing the funds to be withheld.

Defendants argue that since the wage related benefits were incorporated into the pension plan pursuant to a collective bargaining agreement, the trustees' enforcement was required unless modification was necessary to comply with applicable federal standards and that the arbitrary and capricious standard is not applicable. See United Mine Workers of American Health & Retirement Fund v. Robinson, 455 U.S. 562, 102 S.Ct. 1226, 71 L.Ed.2d 419 (1982). That contention, however, misses the point. The wage related provision is not being contested. What is questioned is the trustees' right to forfeit a plan participant's vested rights by taking action which results both in suspending his benefits until age 65 and in reducing much of the accrued and vested pension benefits.

The discrimination that the plan practices against retirees and applicants for retirement, barring participation in any maritime employment while allowing others to continue working in the maritime industries and permiting some retirees, pursuant to the 1981 collective bargaining agreement, to accept, after three years, employment on vessels engaged in offshore drilling, exploration and research, or on vessels ancillary to such operations, and permitting short time employment on vessels engaged in trial runs or being delivered, provided union approval is received and plan trustees are notified, does not seem in the abstract so egregious as to come within the arbitrary or capricious prohibition. Nonetheless, the bar became arbitrary and capricious in its application to Chambless.

In 1976, the union launched a plan to pressure older licensed deck officers to retire. Chambless, who between 1966 and 1975 had regularly received assignments as chief mate or master, was told either to retire or to accept only the lowest grade assignment—second or third mate. Indeed, his only assignments from MM & P hiring halls during 1976 and 1979 were second and third mate jobs. Subsequent to the events in this case, the union sought, through collective bargaining agreement, to secure for older licensed deck officers pension benefits that were not wage related. This would have enabled the union to continue its policy of giving choice assignments to younger men without unduly penalizing the older officers. As of 1979 the union had not succeeded in exacting those benefits from the employer.

The union cannot adopt a policy of forcing applicants to retire or face low paying assignments if they refuse to do so and yet prohibit or penalize them from working apart from MM & P in jobs matching the skills and experience they have acquired. This is another reason why the penalty imposed on Chambless for accepting employment as a master on ships operated by companies not under contract to MM & P is capricious.

A retiree who works in forbidden employment but not as a licensed deck officer on a U.S. flag ocean going vessel operated by a company not under contract to MM & P forfeits his pension for the time he is working and for six months thereafter. One, however, who works as a licensed deck officer on a U.S. vessel under the jurisdiction of a rival union forfeits his pension until age 65. This regulation does not conform to ERISA requirements. It is evident that no forfeiture of benefits can be exacted for competing with an employer. Hummell v. S.E. Rykoff & Co., 634 F.2d 446 (9th Cir.1980); Westwood Chemi-

*cal Co., Inc. v. Kulick,* 570 F.Supp. 1032, 1034 (S.D.N.Y.1983) (Werker, J.); *Bonar v. Barnett Bank of Jacksonville,* 488 F.Supp. 365 (M.D.Fla.1980). Trustees have a fiduciary obligation to act with care, skill, prudence and diligence, 29 U.S.C. § 1104(a)(1)(B), and they must administer the plan solely in the interest of the participants and their beneficiaries. The trustees' basic fiduciary obligation is to maintain the pension fund on a sound economic and actuarial basis. They must not favor one group of participants over others, but where action is taken to preserve or maintain the integrity of the fund which incidentally disadvantages one group of participants, no fiduciary breach of trust has occurred.

In this instance there was testimony by one of the employer designated trustees that he favored Amendment 46's and Amendment 47's forfeiture of benefits for participants who worked for parties not contributing to the MM & P plan, because the plan was very costly and employers wanted participants to work as long as possible so that the employers could get their money's worth.[1] That testimony makes clear that the employer trustees and the union trustees approved the Amendments for different and conflicting reasons.

Employer trustees favored the regulations as a means of keeping participants working on their vessels for a long time. They did not like the idea of bearing the burden of financing a pension plan where employees with 20 years of pension service credit could retire, receive pension benefits, and then go to work for a competing employer in the industry. The union wanted to keep younger licensed deck officers content with their MM & P affiliation. Therefore they pressured the older officers to retire with these provisions. Given the wage related formula for computing pension benefits, the threat to assign older officers lower paying second and third mate jobs was tantamount to a threat to reduce their pensions. Thus they had to choose between retiring and securing a greater pension benefit or continuing to work faced with both a loss of pay and status and also a reduced pension. Amendment 47 was intended to prevent older officers from escaping this Hobson's choice by taking non-MM & P jobs.

Defendants, to the court's surprise, presented no expert actuarial testimony that the penalty imposed in the two amendments was needed or even that it in any way enhanced the financial integrity of the plan. There was no evidence that actuarial considerations were a factor in the trustees' decision to adopt these amendments. Finally, it is impossible to conclude that the financial integrity of the plan is protected by severely penalizing defectors from MM & P ranks, when the impact on the plan's financial well being of those retirees who work in forbidden employment other than on U.S. flag ocean going vessels not covered by MM & P agreement is so insignificant that a denial of benefits while they work and for six months thereafter suffices. There was, moreover, no testimony that the plan's actuaries had advised imposing the penalty or had approved it as needed to safeguard the plan. On the contrary, the amendments were of union origin, drafted by union counsel, and there is noth-

1. Captain Lowen, Union President, on being deposed by plaintiff's counsel before trial, stated that he did not recollect the August 24, 1976 meeting of the trustees—the date Amendments 46 and 47 were adopted. (Lowen Dep. PP 194). He did not recall Bernard Epstein's review of the definition of retirement with the Joint Committee of Trustees at the August, 1976 meeting and did not recall what amendments Epstein had prepared. He did recall Amendments 46 and 47 from just having seen them. *Id.* 196–197. He did not recall having discussed the Amendments with Epstein before the meeting and had only a vague recollection of the meeting when the Amendments were discussed. *Id.* 198.

Nonetheless, at trial on questioning by counsel for the plan Lowen launched into a long and extensive dissertation on the reasoning behind the amendments and the need to protect the integrity of the fund. It is clear that at the pretrial deposition Lowen deliberately frustrated plaintiff's right to discovery. Accordingly, his testimony concerning the basis for these amendments is stricken and will not be considered by the court. F.R.Civ.P. 37.

ing in the record to show that the amendments benefited the plan or its participants.

I conclude, as did the court in *Deak v. Masters, Mates and Pilots Pension Program*, No. 79–190 *slip op.* at 15 (M.D.Fla. June 4, 1984), "Trustees drew a distinction between certain types of re-employment in the industry primarily to protect MM & P by discouraging members who were eligible for their pension from accepting any job which benefited a competing union."

This penalty imposed on Chambless pursuant to Amendment 47 has not been justified, and is at best the product of the trustees' uninformed analysis. *Elser v. IAM National Pension Fund*, 684 F.2d 648 (9th Cir.1982), *cert. denied*, — U.S. —, 104 S.Ct. 67, 78 L.Ed.2d 82 (1983); *Winpisinger v. Aurora Corp.*, 456 F.Supp. 559 (N.D.Ohio 1978).

While the trustees may clearly impose regulations requiring full retirement before they are obligated to award pension benefits, they cannot extract the harsh penalty they imposed on Chambless in this case. The regulation pursuant to which the penalty was imposed is not in the interest of the plan participants or their beneficiaries and is not necessary to maintain the financial integrity of the fund. Accordingly, the action of the trustees was arbitrary and capricious. Moreover, while Chambless could be denied pension benefits while he was still going to sea, he was not adequately informed of the harsh penalty that would be inflicted by his working for a rival union. His inquiry in his undated response to Maher's letter of July 19, 1977 makes clear that he thought he would be denied a pension only during the period he worked.

The action forfeiting his pension until age 65 is declared a nullity. The trustees are ordered to approve Chambless' application for a pension provided he ceases working in the maritime industry and certifies that he has done so and applies for a pension within six months of the date of this decision. If he so applies, the trustees are to treat the application as if it had been made in 1977 and grant him a wage related pension based on his 1967–1977 employment record.

IT IS SO ORDERED.