S & K SALES CO., Appellee,

v.

NIKE, INC., Appellant.

No. 745, Docket 86–7949.

United States Court of Appeals,
Second Circuit.

Argued Jan. 28, 1987.

Decided April 6, 1987.

Winthrop J. Allegaert, New York City (Thomas I. Sheridan, III, Matthew Mosner, Richard O'Neil & Allegaert, New York City, of counsel), for appellant.

Edward Friedman, New York City (Robert D. Kaplan, Friedman & Kaplan, New York City, of counsel), for appellee.

Before OAKES, MESKILL and MAHONEY, Circuit Judges.

OAKES, Circuit Judge:

In this diversity action Nike, Inc., appeals from a judgment entered in the United States District Court for the Southern District of New York, Robert J. Ward, Judge, following a jury trial in which Nike was found liable to S & K Sales Co. ("S & K") for either participating in or knowingly accepting the benefits of a breach of fiduciary duty owed to S & K by a former employee, Norman Johnson. The jury awarded S & K $1,050,000 in compensatory damages and $5,000 in punitive damages. Judge Ward subsequently denied Nike's motion for judgment notwithstanding the verdict, and Nike filed a timely notice of appeal. We affirm.

S & K, a California corporation with its principal place of business in Greenwich, Connecticut, represents some eighty clients in the sale of consumer products to military exchanges. Through its approximately one hundred salaried salespeople located world-

wide, S & K sells both "hard goods," such as electronics, housewares, and food, and "soft goods," primarily apparel and footwear, to military exchanges or commissaries where they are purchased by present and retired American servicemen and their families. S & K's revenues, consisting primarily of commissions from its clients, totalled $9,524,000 in the fiscal year ended June 30, 1984, only $2,000 more than in the previous fiscal year.

Nike, Inc., formerly known as Blue Ribbon Sports, is an Oregon corporation with its principal place of business in Beaverton, Oregon. A well-known manufacturer of athletic footwear and apparel, Nike sells its goods to wholesalers and retailers both directly and through sales representatives. In fiscal year 1984, Nike employed approximately 4,000 people, and had domestic sales in excess of $700 million.

In September 1975, S & K hired Norman Johnson, a former employee, to head S & K's Haviland Fashions division ("Haviland"), which was being established to specialize in the sale of soft goods. As early as March 1978, Johnson wrote to Nike to solicit its business for Haviland. On August 31, 1978, Nike and Haviland entered into an agreement under which Haviland was to represent Nike in sales to the military market in the eastern United States. When Richard Steinberg, owner and president of S & K, learned of this contract, he instructed Johnson to terminate it because of a conflict Steinberg perceived in Haviland's representing both Nike and Wilson Sporting Goods ("Wilson"), an established client. Johnson accordingly informed Nike of Steinberg's decision, and in a letter to Steinberg dated October 11, 1978, Nike terminated its contract with Haviland.

Several weeks after Steinberg's decision, Johnson himself called Nike to state that in his opinion it was a mistake for Haviland to have turned down Nike's business. He proposed that he individually should act as Nike's sales representative using employees not connected with Haviland. Nike

agreed, and on October 1, 1978, ten days before its contract with Haviland was formally terminated, entered into a sales representative agreement with Johnson that was identical to the previous contract with Haviland. Neither Johnson nor Nike ever made this agreement known to S & K or Haviland, and subsequent to the agreement Johnson ceased all sales efforts on behalf of Wilson even though Wilson continued as an S & K client. Nike's commission checks were made payable to and were cashed by Johnson individually until June 1980.[1]

In December 1979, Wilson ended its relationship with S & K and Steinberg asked Johnson to try to get the Nike account back. Johnson, without disclosing the existence of his agreement with Nike, told Steinberg in March 1980 that he had managed to get the Nike account back but that Nike had refused to sign a written contract. Johnson then gave S & K a photocopy of two people shaking hands with the label, "Handshake Agreement with BRS, Inc. Nike Shoes. At this time BRS will not enter into a written agreement." Johnson subsequently informed Nike that Wilson had been terminated and that Haviland staff would begin servicing Nike's account. He later requested that Nike make its commission checks out to himself and Haviland jointly.

This arrangement continued through July 1981, when S & K reorganized its sales force to abandon Haviland's specialization on soft good sales and instead to allow all sales personnel to sell both hard and soft goods. In the wake of this reorganization, and even though S & K had adjusted his compensation, Johnson approached Ladd Lonnquist, Nike's national sales manager, and told him that he was considering leaving Haviland and proposed that Nike terminate S & K and appoint Johnson as the exclusive Nike agent to the military. At Lonnquist's suggestion, on August 14, 1981, Johnson sent Nike a "Personal & Confidential" proposal to this effect, stating that he was prepared to resign

---

1. Nike does not contest on appeal that Johnson was in breach of his fiduciary and contractual duties to S & K.

from Haviland, start a separate agency, and "assume the responsibilities of a 'Nike Head Rep.'" In this letter Johnson also estimated Nike's future sales volume and suggested the possibility of hiring two Nike employees for his new Nike agency.

Johnson's proposal was well received at Nike. In September 1981 Johnson met with a Nike national accounts manager, Kenya Strader, and gave her a draft of a letter addressed to Norman Johnson, as vice president of Haviland Fashions, terminating S & K as Nike's representative. As he gave Strader the letter he explained that "he indeed was vice president of Haviland Fashions," that he wanted to start his own agency, and that "this letter would make it easier for him if [Nike] terminated [its] relationship with Haviland Fashions in lieu of him resigning." With Lonnquist's approval, Strader then signed the letter without revision, dated it September 28, 1981, and sent it to Johnson. When he received this letter, Johnson told Steinberg that Haviland had been terminated because Nike wanted to use its own employees as representatives to the military market. Johnson indicated that he hoped to persuade Nike to reverse this decision, but at no point revealed that he himself had requested that Nike send the termination letter.

Johnson next met with Lonnquist in January 1982 after becoming concerned by Nike's failure to take concrete action on his proposal. At this meeting they discussed the proposal, but Lonnquist balked at Johnson's attempt to procure a higher rate of commission. Johnson then proposed that Nike sign him on as a Nike-exclusive head representative for all military sales, with support from Haviland employees. Lonnquist agreed to this, and on February 2, 1982, wrote to Johnson and enclosed a formal sales representative agreement (the "1982 Agreement"), which Johnson signed individually.

In the meantime, Johnson had told Steinberg that he had gotten Nike back for S & K and that S & K would now handle Nike world-wide. Steinberg authorized Johnson to sign a contract with Nike on S & K's behalf, and Johnson forwarded to Steinberg a copy of Lonnquist's February 2 letter and the signed agreement. Steinberg objected to the facts that the agreement was in Johnson's name only and that Nike's commission checks were being made payable to Johnson. Johnson replied that Lonnquist felt "more comfortable" with Johnson's name on the documents, but assured Steinberg that the names would be changed. These changes were never made. Beginning in February 1982, though, S & K employees began representing Nike to the military world-wide. Through July 1983, Johnson endorsed Nike's commission checks over to S & K. Thereafter he deposited the checks in his own account and drew checks on this account made payable to S & K.

In April 1984, Johnson again submitted a written proposal to Nike that Nike terminate its relationship with S & K and use instead as its military representative a new independent agency to be established by Johnson. Six of the eight individuals whom Johnson proposed to hire for his new agency were current S & K employees, a fact of which Nike was aware. Johnson predicted in his proposal that his new agency would dramatically increase Nike's military sales from a 1983 level of $16 million to $23.7 million in 1985, and he requested that Nike consider an increase in commission rates on the agency's sales. Johnson also sent to Nike a draft of a letter addressed to himself terminating S & K's relationship with Nike, as he had done in 1981.

Nike again reacted favorably to Johnson's proposal. Nike's marketing director for apparel tentatively approved the proposal and forwarded Johnson's draft termination letter to Nike's national sales manager with a note indicating that the letter was "to be followed with [Johnson's] *rehire* as a Nike guy" (emphasis in original). On April 25, 1984, Nike sent a revised letter to Johnson stating that the 1982 Agreement with Johnson would be terminated on May 31, 1984, "[a]s a result of certain internal decisions regarding the distribution of our products." The letter clearly implied that Johnson's relationship

with Nike was also ending, although Nike was aware that Johnson, but not S & K, would continue to deal with Nike.

While still an S & K employee, Johnson met again with Nike executives in Oregon on May 3, 1984, after telling Steinberg's secretary that he would be away "fishing" for a few days. There Nike told Johnson that they had decided to establish an in-house agency with a sales staff of ten to be headed by Johnson. Johnson agreed. Several days later Nike authorized Johnson to offer employment to S & K employees on Nike's behalf, and Johnson accordingly made offers to three S & K employees during the first two weeks of May. A Nike internal memorandum dated May 8, 1984, stated that Nike was "hiring Norm Johnson and his associates to work our military accounts. They formally [*sic*] worked for S & K Company which represents many various product lines."

On Monday, May 7, Johnson called Steinberg to tell him of Nike's termination letter. Without disclosing his role in the termination or Nike's offer of employment, Johnson suggested that he might seek to accept a job with Nike. Johnson and Steinberg met on May 10, and Johnson indicated that he had an offer from Nike and would accept it. On May 18, 1984, Johnson again phoned Steinberg and formally resigned. He confirmed his resignation in a memorandum dated May 30, 1984. Nike terminated its contract the following day, and on June 1, 1984, the three S & K employees to whom Johnson had made offers became Nike employees.

S & K filed its complaint in this action twenty-one days later, initially seeking damages and injunctive relief on claims of participation in a breach of fiduciary duty,

unfair competition, tortious interference with contract, and misappropriation of trade secrets. At trial, S & K proceeded solely on its theory that Nike had participated in and knowingly accepted the benefits of Johnson's breach of fiduciary duty to his employer, S & K. After a seven-day trial, the jury returned a special verdict for S & K, finding specifically that Johnson had breached his duty of loyalty to S & K, that Nike had participated in or knowingly accepted the benefits of the breach, and that S & K was financially injured by Nike's conduct to the tune of $1,050,000 in compensatory damages. The jury also found Nike liable for an additional $5,000 in punitive damages. On a separate issue relating to a pretrial motion to dismiss the complaint that Nike had made on the basis of S & K's failure to comply with N.Y.Bus. Corp.L. § 1312,[2] the jury also found that S & K had been engaged in permanent, regular, and continuous business in New York state between 1968 and 1985. Judge Ward later denied Nike's motion for judgment notwithstanding the verdict or a new trial, but stayed execution of the judgment pending submission of proof that S & K is in full compliance with section 1312 of the New York Business Corporation Law. Nike now appeals.

## DISCUSSION

■ In *Whitney v. Citibank, N.A.*, 782 F.2d 1106, 1115 (2d Cir.1986), we set out the "well settled" elements of a New York claim for inducing or participating in a breach of fiduciary duty:[3]

The claimant must prove (1) a breach by a fiduciary of obligations to another, (2) that the defendant knowingly induced or

---

**2.** N.Y.Bus.Corp.L. § 1312 provides as follows:

(a) A foreign corporation doing business in this state without authority shall not maintain any action or special proceeding in this state unless and until such corporation has been authorized to do business in this state and it has paid to the state all fees, penalties and franchise taxes for the years or parts thereof during which it did business in this state without authority. This prohibition shall apply to any successor in interest of such foreign corporation.

(b) The failure of a foreign corporation to obtain authority to do business in this state shall not impair the validity of any contract or act of the foreign corporation or the right of any other party to the contract to maintain any action or special proceeding thereon, and shall not prevent the foreign corporation from defending any action or special proceeding in this state.

**3.** The parties appear to agree that New York law governs the transaction.

participated in the breach, and (3) that the plaintiff suffered damages as a result of the breach.

Our recognition of this claim in *Whitney* and in prior cases, see *e.g., Newburger, Loeb & Co. v. Gross,* 563 F.2d 1057, 1074 (2d Cir.1977), *cert. denied,* 434 U.S. 1035, 98 S.Ct. 769, 54 L.Ed.2d 782 (1978), is based upon the New York courts' longstanding acceptance of the principle that "[a]ny one who knowingly participates with a fiduciary in a breach of trust is liable for the full amount of the damage caused thereby to the cestuis que trust." *Wechsler v. Bowman,* 285 N.Y. 284, 291, 34 N.E.2d 322, 326 (1941); *Rosen v. Rosen,* 78 A.D.2d 911, 912, 432 N.Y.S.2d 921, 923 (3d Dep't 1980); *Cornale v. Stewart Stamping Corp.,* 129 N.Y. S.2d 808, 814 (Sup.Ct.1954).

Nike argues that the district court erred in refusing to instruct the jury that wrongful intent is an essential element of the tort of participation in a breach of fiduciary duty. It supports this contention with citations to cases involving intentional interference with contractual relations, *e.g., Israel v. Wood Dolson Co.,* 1 N.Y.2d 116, 134 N.E.2d 97, 151 N.Y.S.2d 1 (1956), a tort that in *Whitney,* 782 F.2d at 1115, we stated was "analogous" to a participation claim. *See also Restatement (Second) of Agency* § 312 (1958). But the fact that other torts requiring proof of wrongful intent are analogous does not mean that they are identical. As the New York Court of Appeals noted in *Wechsler,* the gravamen of the claim of participation in a breach of fiduciary duty is the "knowing participation," 285 N.Y. at 291, 34 N.E.2d at 326, of the third party in the fiduciary's breach of trust. *See also Whitney,* 782 F.2d at 1115, 1117; *Newburger, Loeb & Co.,* 563 F.2d at 1074; *Rosen,* 78 A.D.2d at 912, 432 N.Y.S.2d at 923; *Cornale,* 129 N.Y.S.2d at 814; *Restatement (Second) of Torts* § 874 comment c (1977) (a third party who "knowingly assists" a fiduciary in a breach of trust is liable for the harm caused); *cf. id.* § 876(b) (third party is liable for giving "substantial assistance or encouragement" to the tortfeasor's breach of duty). It is true that in some of the cases cited above the third party's actions were sufficiently

egregious that an intent to injure the principal or beneficiary could be inferred, *see, e.g., Whitney,* 782 F.2d at 1116, but in none of them was the factfinder required to do more than find that the third party knew of the breach of duty and participated in it. *Cf. American Republic Insurance Co. v. Union Fidelity Life Insurance Co.* 470 F.2d 820, 824–26 (9th Cir.1972) (third party who knew or should have known of breach of duty cannot "remain silent and accept benefits derived from the activities of" the disloyal employees). *See also Restatement (Second) of Agency* § 313(1).

Nike's reliance on *Duane Jones Co. v. Burke,* 306 N.Y. 172, 117 N.E.2d 237 (1954), is misplaced. In *Duane Jones,* the Court of Appeals considered a claim that Burke, an officer of a third party company, had conspired with a disloyal employee to destroy the plaintiff's business. At trial the jury expressly found that the third party company had not participated in the conspiracy, but that Burke had. The Court of Appeals upheld the Appellate Division's reversal of the jury's finding that Burke had participated in the conspiracy. The court concluded from several factors, including the absence of a "desire to injure plaintiff's business" and the fact that neither Burke nor his company "made any profit or received any financial advantage" from the employee's breach of duty, that Burke had not participated in the alleged conspiracy to destroy the plaintiff's business. 306 N.Y. at 194–95, 117 N.E.2d at 248–49. *Duane Jones,* which on its face deals with a claim different from the participation claim alleged here, stands at most for the proposition that a third party's wrongful intent may be indicative of "participation." The case does not stand for the proposition that such intent is a necessary prerequisite to a finding of participation.

In line with its argument on intent, Nike contends that the district court should either have found as a matter of law or have instructed the jury that Nike could not be found liable unless it acted *solely* out of a malicious intent to harm S & K. Again, Nike supports this contention with citations

to cases involving intentional torts other than the participation claim raised here. *E.g., Marcella v. ARP Films Inc.*, 778 F.2d 112, 119 (2d Cir.1985) (prima facie tort); *Alvord & Swift v. Stewart M. Muller Construction Co.*, 46 N.Y.2d 276, 281–82, 385 N.E.2d 1238, 1241, 413 N.Y.S.2d 309, 312 (1978) (intentional interference with contractual relations). Nike's request for an instruction on this "justification" or "business purpose" defense was properly denied, for, as we have indicated above, the tort of participation in a fiduciary's breach of duty simply does not require proof of an intent to harm.

█ Somewhat more substantial is Nike's claim that the court erred by instructing the jury that it could find Nike liable if it found that Nike "participated in Johnson's breach of his duty of loyalty, *or* that Nike knowingly accepted the benefits of Johnson's breach of his duty of loyalty." (Emphasis added.) Nike objects to the court's use of the disjunctive and argues that it cannot be found liable for mere knowing acceptance of benefits. We recognize that the instruction might have been better phrased, as did Judge Ward in his decision on the motion for judgment notwithstanding the verdict, but we do not find that the court's charge was sufficiently confusing or prejudicial to warrant reversal. *See National Railroad Passenger Corp. v. One 25,900 Square Foot Parcel of Land*, 766 F.2d 685, 688 (2d Cir.1985) (new trial will be granted "because of an error in the jury instructions only if, based on a review of the record as a whole, ... the error was prejudicial"). We reach this conclusion for two reasons.

First, although *Wechsler* and *Whitney* do not use the term "knowing acceptance," its use is supported by the Ninth Circuit's decision in *American Republic Insurance*

*Co. v. Union Fidelity Life Insurance Co.*, 470 F.2d 820 (9th Cir.1972). There the court found Union Fidelity liable to its competitor, American Republic, for the acts of American employees who accepted positions with Union and then, before terminating their relationship with American, solicited other coworkers to leave with them and used American's customer lists to solicit business for Union. Finding that "Union was, or should have been, aware that [these activities] were going on," the court concluded that "Union could not remain silent and accept benefits derived from the activities of" the disloyal employees. *Id.* at 824; *see also Restatement (Second) of Agency* § 312 comment d ("The principal has ... rights against one who, knowing of the contract of employment, employs the agent and benefits from the employment.").

We recognize that most authorities on the participation claim indicate that the third party's degree of involvement in the fiduciary's breach of duty must amount to "knowing participation," *Whitney*, 782 F.2d at 1115; *Wechsler*, 285 N.Y. at 291, 34 N.E.2d at 326, "knowing assistance," *Restatement (Second) of Torts* § 874 comment c, or "substantial assistance or encouragement," *id.* § 876(b). Nonetheless, we find that even if the district court's instruction was wrong to imply that Nike might be liable for mere "knowing acceptance of benefits," Nike could not have been prejudiced because the charge as a whole correctly conveyed to the jury the proper standard and emphasized the element of "participation" as the essence of the claim. After making the participation or knowing acceptance charge, the court went on to instruct the jury as to the specific factual findings that could lead them to find for S & K.[4] These instructions make clear that

---

**4.** The court's charge was as follows:

If upon all the evidence you find that Nike was aware that Johnson was an S & K employee but nevertheless accepted and acted upon Johnson's encouragement to terminate its business relationship with the plaintiff and to use Johnson as its representative to the military, you may conclude that the defendant

participated in *and* accepted the benefits of Johnson's breach of duty.

If, on the other hand, you conclude that the defendant did not know that Johnson was an S & K employee at the time it terminated its business relationship with S & K and offered Johnson a position as a Nike employee, then you may find that defendant did not partic-

each such factual finding would support the conclusion that Nike participated in Johnson's breach *and* the conclusion that Nike accepted the benefits of that breach. At no time did the court set forth any factual scenario that would have allowed the jury to find Nike liable only on a knowing acceptance theory. Taken as a whole, then, the court's instructions did not "confuse or mislead the jury as to the principles of law that apply to the facts." *National Railroad Passenger Corp.*, 766 F.2d at 688.

■ Moreover, there is ample evidence from which the jury could have concluded that Nike participated in Johnson's breach of duty to S & K. Specifically, the evidence showed that in 1978 Nike executives entered into an agreement with Johnson even though they knew he was an S & K employee and that S & K itself had requested the termination of its Nike contract because of the conflict with Wilson. In 1981 and again in 1984, Nike accepted Johnson's proposals that it terminate S & K's relationship with Nike and substitute Johnson or his own agency as Nike's military sales representative. Indeed, Nike aided Johnson by sending misleading termination letters for the sole reason that Johnson requested them. In 1984, Nike not only acted upon Johnson's proposal to terminate S & K, but also authorized Johnson to make offers of employment on Nike's behalf to other S & K employees at a time when Nike knew that Johnson was still an S & K employee and that S & K was unaware of the real reasons for Nike's termination. In light of this evidence, we agree with the district court's conclusion that as early as 1978 "there were red flags flying all over the place," *Whitney*, 782 F.2d at 1116, concerning the propriety of Johnson's actions. The jury could properly have concluded that Nike knowingly partic-

ipated in Johnson's breach of duty to S & K by virtue of its confidential business arrangements with Johnson that were fundamentally in conflict with Johnson's obligations as an S & K employee. Accordingly, we find that the district court's instructions on the requisite degree of Nike's involvement in Johnson's disloyal acts did not prejudice Nike and therefore provide no grounds for reversing the judgment below.

■ Nike next argues that the court below erred by not charging the jury on whether S & K consented to Johnson's division of his loyalty between S & K and Nike. In particular, Nike challenges both the court's use of the word "utmost" rather than "undivided" to describe Johnson's duty to S & K, and its rejection of Nike's proposed charge on S & K's consent to Johnson's actions. These claims are meritless. The court's instruction that "[e]very employee must act with the utmost good faith and loyalty in performing his duty" is lifted almost verbatim from *Duane Jones*, 306 N.Y. at 188, 117 N.E.2d at 245, and is consistent with the standard set forth in relevant cases. *E.g.*, *Westwood Chemical Co. v. Kulick*, 570 F.Supp. 1032, 1036 (S.D. N.Y.1983) ("utmost good faith and loyalty"); *AGA Aktiebolag v. ABA Optical Corp.*, 441 F.Supp. 747, 754 (E.D.N.Y.1977) (same); *Cornale*, 129 N.Y.S.2d at 815 ("utmost good faith"). It was, therefore, not erroneous for the court to charge the jury on Johnson's duty of utmost good faith. Nor was it error for the court to reject Nike's proposed charge on consent. Nike requested an instruction that Steinberg's knowledge that Johnson's name, not S & K's, was on the 1982 Agreement with Nike was enough to establish S & K's consent to Johnson's "divided" loyalty. But as this court noted in *Renz v. Beeman*, 589 F.2d 735, 744 (2d Cir.1978), *cert. denied*, 444

ipate in Johnson's breach of duty *and* did not knowingly accept the benefits of that breach.

The parties agree that in early May, 1984, the defendant authorized Norman Johnson to offer employment on defendant's behalf to Karen Westmoreland, Mitch Fields, and Gina Stafford. If you conclude that at the time defendant authorized Johnson to make these offers it knew that Johnson, Westmoreland,

Fields and Stafford were employees of plaintiff S & K, you may find that defendant participated in *and* accepted the benefits of Johnson's breach of duty.

If you find that defendant did not know that Johnson was an S & K employee, you may find that defendant did not participate in or accept the benefits of Johnson's breach. (Emphasis added.)

U.S. 834, 100 S.Ct. 65, 62 L.Ed.2d 43 (1979), a breach of trust case to be sure, consent to self-dealing by a fiduciary must be "clearly proved" and "made with a full knowledge of all the material particulars and circumstances." *See also Restatement (Second) of Agency* § 392 comment b (fiduciary must disclose all relevant facts, including "prior relations" with the third party). There is simply no support in the record for the contention that Johnson made the full disclosure of his relations with Nike that is a prerequisite of any consent by S & K to his disloyal activities. Additionally, Nike's contention that the jury charge on consent was inadequate is belied by the record; several times the court instructed the jury that acts by an employee that would otherwise constitute a breach of fiduciary duty would not be a breach if done with the employer's knowledge and consent. In light of the evidence presented at trial, and taking the court's instructions as a whole, we cannot say that the jury charge was erroneous.

■ Nike launches several attacks on the district court's award of damages. It argues first that it could not be liable in damages for breaking the 1982 Agreement because that agreement was terminable on thirty days' notice. As Judge Ward rightly noted, though, the fact that the agreement was terminable without cause is irrelevant when "the conduct alleged breaches a legal duty which exists 'independent of contractual relations between the parties.' " *Hargrave v. Oki Nursery, Inc.,* 636 F.2d 897, 899 (2d Cir.1980) (quoting *Channel Master Corp. v. Aluminum Limited Sales, Inc.,* 4 N.Y.2d 403, 408, 151 N.E.2d 833, 836, 176 N.Y.S.2d 259, 263 (1958)). Here, the duty breached by Johnson and participated in by Nike was clearly different from and independent of any duties under the 1982 Agreement. Thus, once it is established that the agreement was terminated as a result of Nike's participation in Johnson's breach, S & K was entitled to recover for its loss. *See Whitney,* 782 F.2d at 1115 (plaintiff is entitled to recover for "any damage" caused); *see also Restatement (Second) of Torts* § 874 & comment c.

■ Nike's second argument is that the court erred in allowing S & K to recover its lost profits. The essence of Nike's argument is drawn from the trust law principle that a "transferee with notice" of a fiduciary's breach is liable only for restoration of the trust property received or restitution of the value of the property or benefits received. *See, e.g., Restatement (Second) of Trusts* § 291 (1959). However, as Nike itself points out in its brief, a third person who knowingly participates in a breach of trust "is liable to the beneficiary for any loss caused by the breach of trust." *Id.* § 326; *see also Whitney,* 782 F.2d at 1115; *Rosen,* 78 A.D.2d at 912, 432 N.Y.S.2d at 923; *Cornale,* 129 N.Y.S.2d at 814; *Restatement of Restitution* § 138(2) (1937). *Ballantine v. Ferretti,* 28 N.Y.S.2d 668 (Sup.Ct.1941), on which Nike relies heavily, is not to the contrary. There, the court stated that "[m]ere knowledge of [a conspiracy to breach a fiduciary duty], or even acquiescence therein ..., does not make the doer of [an act which aids the conspiracy] jointly and severally liable for all damage resulting from the conspiracy." *Id.* at 691. But, as Nike admits, a defendant who was found to have knowingly participated in the breach was held liable "for all damages which his acts caused." *Id.* at 690. Here, where the essence of S & K's claim was that Nike participated in Johnson's breach and where there was ample evidence from which the jury could infer that Nike had in fact participated in the breach, the court was correct to instruct the jury that it could "award such damages as will reasonably compensate [S & K] for such injury and damage as you find ... that [S & K] has sustained as a proximate result of Norman Johnson's and Nike's wrongful conduct." And the court correctly charged that lost profits were an appropriate measure of the damages suffered by S & K. *See, e.g., American Republic Insurance Co.,* 470 F.2d at 827 (upholding lost profits award against third party participant); *Westwood Chemical Co.,* 570 F.Supp. at 1037 (damages from employees' breach of duty include lost profits); *Duane Jones,* 306 N.Y. at 192, 117 N.E.2d at 247 (lost profits from diverted accounts recoverable

by beneficiary); *cf. Financial Programs, Inc. v. Falcon Financial Services, Inc.* 371 F.Supp. 770, 777–78 (D.Ore.1974) (lost profits recoverable against third party who participated in employees' unfair competition against employer).

Nike contends also that S & K failed to prove that it lost any profits, that S & K's reduced expenses and new business more than offset its loss of income derived from Nike sales, and that the compensatory damages were excessive. In reviewing these claims we keep in mind that under New York law while S & K is required to establish with certainty that it suffered some loss, it need not prove the amount of loss with certainty. *Contemporary Mission, Inc. v. Famous Music Corp.,* 557 F.2d 918, 926 (2d Cir.1977). Rather, S & K need only provide the jury with a sound basis for approximating with reasonable certainty the profits lost as a result of Johnson's and Nike's actions. *Id.; Westwood Chemical Co.,* 570 F.Supp. at 1038 n. 3; *Duane Jones,* 306 N.Y. at 192, 117 N.E.2d at 247–48; *Wolf Street Supermarkets, Inc. v. McPartland,* 108 A.D.2d 25, 33–34, 487 N.Y.S.2d 442, 449 (4th Dep't 1985).

We agree first of all with the district court's conclusion that S & K was damaged by termination of the 1982 Agreement as a result of Johnson's and Nike's acts. Nike's assertion that the proof of any lost profits was purely speculative, *see Kenford Co. v. County of Erie,* 67 N.Y.2d 257, 261, 493 N.E.2d 234, 235, 502 N.Y.S.2d 131, 132 (1986), is belied by the evidence. In the calendar year ending December 31, 1983, Nike's sales to the military through S & K amounted to about $16.3 million, with S & K earning commissions from Nike of approximately $357,000 or 2.2%. In the first fiscal year after Nike terminated the 1982 Agreement, S & K's exchange division sales dropped almost $14 million, with a corresponding drop in commissions. This clearly is evidence from which the jury could have concluded that S & K had in fact been damaged by Nike's termination of S & K.

Nike's primary objection is to the way in which S & K's estimated lost profits were presented to the jury. In particular, Nike argues that S & K's projections of future Nike sales were much too high, and that its projections of future Nike-related expenses were too low. But as the district court pointed out, there were two base figures from which the jury could have calculated S & K's lost profits. The first was the undisputed evidence of S & K's sales and commissions on Nike products for the last full year of sales under the 1982 Agreement. The second basis was the $24 million estimate of fiscal year 1985 sales made by Johnson in his 1984 proposal to Nike and adopted by Nike's own national sales manager in an internal memorandum to Nike executives. While this $24 million projection for 1985 may seem high in light of sales under the 1982 Agreement, Nike's claim that it is purely speculative has a hollow ring when a high-level Nike executive experienced in sales found the projection sufficiently credible to approve the termination of S & K and the establishment of a Nike military sales representative. Thus, it was not erroneous to allow the $24 million figure to be presented to the jury, nor for S & K to show that that sales level would have resulted in roughly $600,000 in commissions in 1985. In addition, we agree with the district court that S & K's protection of Nike sales over a five-year period, based upon a 10% per year sales increase, was relevant and probative in light of S & K's typically longstanding relations with its clients and the lack of evidence that Nike would have terminated S & K even without Nike's participation in Johnson's disloyal acts.

We also reject Nike's contentions regarding the inclusion of S & K's costs and expenses in the calculation of lost profits. As we have noted, "in arriving at a determination of damages for a defendant's wrongful conduct, if any benefit or opportunity for benefit appears to have accrued to the plaintiff because of the breach, a balance must be struck between benefit and loss, and the defendant is only chargeable with the net loss." *Stern v. Satra Corp.,* 539 F.2d 1305, 1311–12 (2d

Cir.1976). Here, to arrive at its estimate of its lost profits, S & K reduced its projected commissions by the salaries and expenses it saved as a result of losing Nike's business and by the commissions it expected to earn from sales of Puma products, a line that S & K acquired after Nike's termination. Nike complains that S & K inadequately proved its variable costs of handling Nike's products. But we see no reason to overturn the district court's rejection of Nike's proposed "fixed-cost" calculations when Nike's own expert conceded that a fixed-cost analysis, which assumes that each account should bear its pro rata share of total expenses in proportion to its share of total sales, would be inaccurate without incorporating other factors such as the cost of producing Nike sales relative to that of other accounts. The witness preferred his prepared analysis of S & K expenses based upon the reduction in S & K's variable costs caused by Nike's termination. But even then he admitted that his calculations of S & K's savings from losing Nike were based on unproven assumptions about the number of sales positions S & K could have eliminated after the loss of the Nike account. Indeed, the expert's assumptions were partially contradicted by another Nike witness, Fields, who admitted that S & K could not have laid off additional regional sales personnel after Nike's termination without impairing the representation of S & K's other clients. All in all, the jury was presented with different approaches toward calculating S & K's net loss with reasonable certainty and the jury was clearly within its rights to disregard, as it apparently did, Nike's fixed-cost analysis, particularly in light of its admitted weaknesses.

■ In its remaining challenge to the jury's award of compensatory damages, Nike argues that the award of $1,050,000 was so large "that it would be a 'denial of justice to permit it to stand.'" *Mileski v. Long Island Rail Road Co.*, 499 F.2d 1169 1173 (2d Cir.1974). We disagree. We have held that where, as here, the trial judge has let the verdict stand, we will "order a new trial only when the verdict is irrational or so high as to shock the judicial conscience,

rendering it an abuse of discretion not to set it aside." *Batchkowsky v. Penn Central Co.*, 525 F.2d 1121, 1124 (2d Cir.1975). The district court's conclusion that the $1,050,000 award was "substantial but not excessive" is supported by the evidence presented at trial as to the amount of the loss suffered by S & K and the likelihood that S & K would have continued its relationship with Nike but for the disloyal acts of Johnson and Nike's participation in those acts. The district court did not abuse its discretion in allowing the verdict to stand.

■ Nike's final contention is that S & K's suit should have been dismissed because S & K failed to comply with New York Business Corporation Law § 1312(a), *see* note 2 *supra*, while it allegedly did business in New York during 1968–1985. However, as the district court noted, there is no evidence that S & K was acting fraudulently in 1985 when it finally did apply for authorization to do business in New York, although the court did conclude that the 1985 application wrongly stated that S & K had not been doing business from 1968 to 1985. Both parties admit that failure to comply with section 1312 is not a jurisdictional impediment. *Tri-Terminal Corp. v. CITC Industries, Inc.*, 78 A.D.2d 609, 609, 432 N.Y.S.2d 184, 185 (1st Dep't 1980). *Tri-Terminal* makes it clear that an appropriate remedy for a section 1312 violation is a conditional dismissal or stay of the action pending cure of the violation. However, in *In re Grand Bahama Petroleum Co. v. Asiatic Petroleum Corp.*, 550 F.2d 1320 (2d Cir.1977), we read the Supreme Court's holding in *Allenberg Cotton Co. v. Pittman*, 419 U.S. 20, 95 S.Ct. 260, 42 L.Ed.2d 195 (1974), for the proposition that a state "door closing" statute, such as section 1312(a), "may not impede a diversity action concerning interstate or foreign commerce ... brought in a federal court." 550 F.2d at 1326. Here, when a full and fair trial of the issues has already taken place, the district court's imposition of a stay of judgment thus appropriately balances the state interest in enforcing its business licensing requirements with the federal interest in

efficient disposition of federal diversity cases involving interstate commerce.

Judgment affirmed.