*242
 
 OPINION AND ORDER
 

 MUKASEY, District Judge.
 

 Plaintiffs Georg Kolbeek
 
 et al.
 
 — 32 German, Austrian, Swiss and Italian investors— move to amend their complaint, following dismissal of their prior amended complaint, to allege that LIT America, Angus Jackson, Michael Rose, Lawrence Rose, Refco and Leonard Alpert aided and abetted a breach of fiduciary duty in violation of New York law. Defendants Refco and LIT America have opposed that motion. For the reasons that follow, plaintiffs’ motion is denied.
 

 I.
 

 In a prior opinion, reported at 923 F.Supp. 557 (S.D.N.Y.1996), familiarity with which is assumed for present purposes, I dismissed plaintiffs’ claims for fraud under the Commodity Exchange Act (“CEA”) and common-law fraud, for failure to plead with particularity, Fed.R.Civ.P. 9(b), and I dismissed plaintiffs’ claims for conversion under the CEA, negligence and breach of fiduciary duty for failure to state a claim upon which relief could be granted, Fed.R.Civ.P. 12(b)(6). I permitted plaintiffs to replead only a state-law claim for participating in a breach of fiduciary duty, according to the terms to be set at a pretrial conference. Those terms, set at a conference on May 7, 1996, and embodied in an order dated May 17, 1996, required plaintiffs to submit a proposed second amended complaint, and factual support for their claim. (5/17/96 Order)
 

 The facts alleged in the proposed pleading and the accompanying exhibits, many of which mirror the allegations in the first amended complaint, are as follows: German national Christian Schindler established the Falcon Investment Corporation (“FIC”) and other companies to solicit money from Europeans for investment in American commodity futures and options markets. Plaintiffs collectively invested approximately $4 million with Schindler’s companies. (Compl. ¶2) Schindler did not register his companies with the Commodities Futures Trading Commission (“CFTC”), in violation of § 4d(l) of the CEA, 7 U.S.C. § 6d(l) (1994).
 

 On March 26, 1991, FIC opened its first account with Refco, a New York brokerage firm and registered futures commissions merchant (“FCM”).
 
 (Id.
 
 ¶¶8, 12, 12(a)) To set up that account, Schindler completed Ref-co’s Customer Agreement and represented therein that he was the President and Secretary of FIC. Schindler listed no other corporate officers.
 
 (Id.
 
 ¶ 12(d)) Schindler stated that he and Ernst Naderer were authorized to trade in and withdraw money from the account.
 
 (Id.
 
 ¶ 12(j)) Schindler faded to meet Refco’s request for FIC’s most recent financial statement.
 
 (Id.
 
 ¶ 12(g)) At approximately the same time the first account was approved, FIC opened two additional accounts at Refco.
 
 (Id.
 
 ¶ 12(i)) At all relevant times, defendant Leonard Alpert was a Refco employee and the account executive for FIC’s accounts.
 
 (Id.
 
 ¶ 9)
 

 From April through June 1991, there was heavy trading in the three FIC accounts at Refco. The first account, number A92356299, opened on April 23, 1991 with $370,-000.00.
 
 (Id.
 
 ¶¶ 12(e), 12(k)) During the following week, that account traded over 800 “roundtum futures contracts” and on April 30 had a balance of $264,007.31. The next month, that same account traded over 2000 roundtum futures contracts and on May 31 had a balance of $82,917.09. In June, the account traded over 400 roundtum futures contracts and had shrunk to only $1,000.00 by June 29,1991.
 
 (Id.
 
 ¶ 15) From April 23 to October 29,1991, $4,600 was withdrawn from the three FIC Refco accounts to pay the salary of defendant Lawrence Rose, one of Schindler’s employees.
 
 (Id.
 
 ¶ 16)
 

 On October 28,1991, an Austrian shipping company, Paul Gunther Transportgesellschaft GmbH (“Gunther”), sued Schindler and FIC in New York Supreme Court, in an action styled
 
 Paul Gunther Transportgesellshaft m.b.h. v. Schindler & Falcon Investment Corp.
 
 (the “Gunther action”).
 
 (Id.
 
 ¶ 17) The Gunther complaint alleged that Schindler and FIC breached their contract with Gunther by failing to maintain a minimum balance of $400,000 in the Gunther account, and by failing to pay those funds to Gunther upon demand. (Gunther Compl. ¶¶ 6-7)
 

 
 *243
 
 Gunther sought also an Order to Show Cause (“OSC”) for an Order of Attachment and a Temporary Restraining Order. The papers in support of the OSC alleged that:
 

 [FIC] is a foreign corporation not qualified to do business in the state and defendants, with intent to defraud their creditors or frustrate the enforcement of a judgment that might be rendered in plaintiffs favor, has [sic] disposed of, or secreted property, or removed it from the state, that several causes of action for a money judgment exist in favor of plaintiffs against said defendants for the sum of $400,000.00 ... and that it is probable that plaintiffs will succeed on the merits____
 

 (Compl. Ex. A at 2) Justice Karla Moskowitz signed the OSC restraining Schindler, FIC and “all other persons and garnishees ... from transferring or paying any assets ... or personal property [of Schindler and FIC] ... to the extent of $400,000,” and scheduled a hearing to determine whether Schindler or FIC’s assets should be attached.
 
 (Id.
 
 at 3)
 

 Supporting the OSC was the affidavit of Gunther’s attorney, Manfred Linden. Linden alleged that Ernst Naderer, a Gunther employee and the only person other than Schindler authorized to trade the first FIC account,
 
 supra
 
 p. 2, embezzled $400,000 of Gunther’s funds and used that money to open the Gunther account with FIC. (Linden Aff. ¶¶ 2, 7) The agreement between Gunther and FIC originally provided that the funds were to he placed with Cargill Investors, but later was changed to designate Refco as the brokerage firm.
 
 (Id.)
 
 The agreement was amended also to require that a “minimum of the amount of $400,000.00 is to remain in this account for Mr. Ernst Naderer’s use at all times.”
 
 (Id.
 
 ¶ 4) Linden alleged that Schindler and FIC ignored both Naderer’s demands to return the funds and Linden’s own attempts at communication,
 
 (Id.
 
 ¶¶ 5-6, 8-9) and that:
 

 As a result of the actions of Mr. Schindler, [Gunther is] being frustrated in the enforcement of a judgment that might be rendered in [its] favor in action for recovery of these sums and Mr. Schindler is secreting these funds.
 

 (Id.
 
 ¶ 10) Attached to Linden’s affidavit were: the investment agreement between Gunther and FIC; the supplemental agreement providing that the account would maintain a minimum balance of $400,000.00; and FIC’s Refco customer account application. (Compl. ¶ 17(b))
 

 Attached also to the OSC were Naderer’s July 1, 1991 letter to Schindler directing the maintenance of the $400,000 safety fund and Naderer’s September 2, 1991, facsimile to Schindler citing an unmet deadline for payment and threatening legal action. James M. Kenney, Linden’s attorney, filed an affidavit stating that FIC was evicted from its office at 40 Wall Street in Manhattan and had moved to Miami; that FIC was not registered to do business in New York; and that Alpert informed him FIC had no funds in Gunther’s account but funds in other Refeo accounts. (Kenney Aff. ¶¶ 2-5) There was also a letter dated May 18,1990 to Schindler from his attorneys, Beckman and Associates, warning him not to trade commodities in the U.S. without registering under the CEA
 

 On October 29, 1991, a copy of the complaint and OSC was served on Ivan M. Brawer, the Secretary/Controller of Refco. The OSC was served also on three other investment firms — Lehman Brothers, Prudential Securities, Inc. and Dominick & Dominick, Inc. (Manning Aff. ¶¶ 2, 4-5) The OSC was not served on any of the other defendants here.
 

 A week later, on November 6,1991, Schindler filed an affidavit in opposition to Gunther’s motion for an attachment. There, Schindler stated that:
 

 the monies presently restrained by the temporary order of this Court which are in the possession of Refco, do not belong to [Schindler or FIC], but instead are being held on account on behalf of other clients of FIC, Inc,
 

 and that said monies “are being held in trust on behalf of persons not owing a debt to [Gunther].” (Schindler Aff. ¶¶ 14-15) Schindler stated also that:
 

 unfortunately, as of July 1, 1991, the monies invested by Mr. Naderer on behalf of the plaintiff fell victim to unsuccessful in
 
 *244
 
 vestments and as of July 1,1991, there was no balance left in said account.
 

 (Id.
 
 ¶ 11) There is no allegation that Schindler’s affidavit was served on Refco, Alpert, or any of the other defendants here. On November 8, 1991, Justice Moskowitz vacated the OSC and denied Gunther’s application for an attachment. (Def.Mem.Ex.A)
 

 Refco and Alpert complied with the OSC while it was in effect, and thereafter continued to service Schindler’s accounts. On several occasions in or about January 1992, Alpert accompanied Schindler and Schindler’s potential clients, including certain unspecified plaintiffs, on tours of the Refco offices and the floor of the New York Futures Exchange (“NYFE”).
 
 (Id.
 
 ¶25) On one occasion, Alpert met with Schindler and plaintiff Thilo Lipkow at Refeo’s offices and solicited Lip-how’s investment in Refeo’s Global Futures Fund.
 
 (Id.
 
 ¶ 27)
 

 Between October 1991 and July 1992, Schindler solicited $2.6 million in new investments for his Refco accounts.
 
 (Id.
 
 ¶ 29) Approximately $1.5 million of that sum was solicited from certain unnamed plaintiffs for Refeo’s Global Futures Fund.
 
 (Id.
 
 ¶ 33) But without plaintiffs’ knowledge, Schindler transferred those funds into his own copycat Global Futures Fund, Ltd, for which he opened an account at defendant LIT America.
 
 (Id.
 
 ¶¶ 30, 34, 35)
 

 In July 1992, the CFTC began to investigate Schindler and his companies. As part of that investigation, the CFTC requested certain documents from Refco and LIT, and Refco had Schindler sign a statement that neither he nor FIC was doing business with the public.
 
 (Id.
 
 ¶ 28) Shortly thereafter, in December 1992, Friedrich Wieder and Hans Gerd-Munch, two of the plaintiffs in this action, sued FIC and other Schindler companies in this court, in an action styled
 
 Wieder v. F.I.C. Inc.,
 
 92 Civ. 9377 (MBM).
 
 (Id.
 
 ¶ 32) On March 4,1993 certain plaintiffs notified LIT and Angus Jackson that they were investors in Schindler’s Global Futures Fund, Ltd, and demanded immediate liquidation of their investments.
 
 (Id.
 
 ¶¶ 36-37) Unbeknownst to plaintiffs, Schindler looted approximately $200,000 from the Global Futures Fund account at LIT between February and April 1993.
 
 (Id.
 
 ¶ 39)
 

 Plaintiffs now allege that, because of the above-described conduct, defendants LIT America, Angus Jackson, Michael Rose, Lawrence Rose, Refco and Leonard Alpert:
 

 aided and abetted in violations of fiduciary duties owed by Schindler, FIC, and/or Global Futures Fund, Ltd., as trustees to clients’ monies to, among other things, avoid self-dealing, conversion of trust assets, and failure to disclose material risks and information regarding futures trading (including the risks associated in dealing with a non-registered entity) in that they (a) failed to diligently investigate the violations of fiduciary duties owed to the clients of Schindler, FIC, and/or Global Futures Fund, Ltd., when put on notice of the same; (b) participated in the breach through lack of diligent investigation; and (c) ... otherwise helped conceal the breaches of fiduciary duty through nondisclosure to the clients-beneficiaries of the monies and property ... held in trust.
 

 (Compl. ¶¶ 43, 47)
 

 II.
 

 Subject matter jurisdiction for this action is premised on diversity of citizenship. 28 U.S.C. § 1332(a)(1). Plaintiffs are citizens of foreign states — Germany, Switzerland, Austria and Italy — and defendants are citizens of New York, New Jersey and Florida. The amount in controversy exceeds $50,000. (Compl. ¶ 10)
 

 III.
 

 A party may amend its complaint more than 20 days after service of that complaint “by leave of court or by written consent of the adverse party.” Fed.R.Civ.P. 15(a) (1994). Leave to amend “shall be freely given when justice so requires.”
 
 Id.
 
 However, leave to amend should be denied when the amendment would be futile,
 
 ie.,
 
 when the amended complaint would be dismissed pursuant to Fed.R.Civ.P. 12(b)(6), for failure to state a claim upon which relief can be granted.
 
 Foman v. Davis,
 
 371 U.S. 178, 181, 83 S.Ct. 227, 229-30, 9 L.Ed.2d 222 (1962). In considering a motion to amend,
 
 *245
 
 the court accepts the facts as stated in the complaint as true and draws all reasonable inferences in plaintiffs’ favor.
 
 Conley v. Gibson,
 
 355 U.S. 41, 45-46, 78 S.Ct. 99, 101-102, 2 L.Ed.2d 80 (1957). A motion to amend should be denied on the ground of futility only if it appears beyond doubt that plaintiffs can prove no set of facts that would entitle them to relief.
 
 Id.
 
 at 45, 78 S.Ct. at 101-102.
 

 The elements of a claim for aiding and abetting a breach of fiduciary duty under New York law are: (1) a breach by a fiduciary of obligations to another, (2) knowing participation by defendant in the breach, and (3) damages to plaintiff.
 
 S & K Sales Co. v. Nike, Inc.,
 
 816 F.2d 843, 847-48 (2d Cir. 1987). To the extent the underlying primary violations are based on fraud, the allegations of aiding and abetting liability must meet the particularity requirements of Fed.R.Civ.P. 9(b).
 
 Id.
 

 To analyze a claim of secondary liability, the court first must determine the contours of the primary violation on which the secondary liability is alleged to be based. Here, the primary liability is Schindler’s. Plaintiffs trusted him with their money and he owed them a fiduciary duty. By “self-dealing” and “converging] trust assets,” Schindler breached that duty. (Compl. ¶¶43, 47) Plaintiffs suffered significant financial harm as a result of that breach. Plaintiffs thus have satisfied the first and third elements of the claim.
 

 At issue here is whether the proposed amended complaint alleges facts to show that defendants “knowingly participated” in Schindler’s looting of plaintiffs’ accounts. Plaintiffs, relying exclusively on
 
 Diduck v. Kaszycki & Sons Contractors, Inc.,
 
 974 F.2d 270 (2d Cir.1992), contend that “constructive knowledge” is enough to support aiding and abetting liability. The facts of
 
 Diduck
 
 are as follows: in 1980 Donald Trump teamed with the Equitable Life Assurance Society (together, “Trump-Equitable”) to demolish the Bonwit Teller building on Fifth Avenue in Manhattan, and make way for the construction of Trump Tower. Trump-Equitable hired Kaszyeki & Sons Contractors for the demolition work, and Kaszyeki hired undocumented, non-union Polish immigrants, and paid them off the books in violation of federal wage and tax laws. Kaszyeki then hired union workers and entered into a collective bargaining agreement obligating it to contribute to the union’s ERISA-covered pension fund. Certain of the Polish workers were covered by the agreement, but because those workers were not listed on KaszycM’s books, Kaszyeki made no pension payments on their behalf.
 
 Id.
 
 at 274.
 

 At some point Kaszyeki failed financially and Trump-Equitable took over the job’s finances, including payments to the union funds. Still, no payments were made for the unlisted workers.
 
 Id.
 
 Fund participants and beneficiaries charged that by failing to inform the funds that they were entitled to payments for the Polish workers, the union president breached his fiduciary duty in violation of § 404 of ERISA, 29 U.S.C. § 1104 (1994). Plaintiffs sued the Trump entities for participating in the president’s breach.
 
 Id.
 
 at 274-75.
 

 First, the Second Circuit considered whether ERISA creates a right of action in favor of plan participants against a non-fiduciary who knowingly participates in a fiduciary’s breach of duty.
 
 Id.
 
 at 279-80. Although the statute does not expressly create that right, the Court explained that “[p]rineiples of trust law are appropriately factored into ERISA to develop a federal common law of employee benefit plans where to do so is not inconsistent with the legislative scheme and where it furthers the remedial objectives of the statute.”
 
 Id.
 
 at 281. Reasoning that a federal common law right of action against those who aid and abet an ERISA-fiduciary’s breach of duty would advance Congress’ goal of uniformity and would ensure that plan participants and beneficiaries obtain the benefits to which they are entitled, the Court held that the right of action existed.
 
 Id.
 

 Next, the Court considered the contours of that right of action generally, and the “knowing participation” element in particular.
 
 Id.
 
 at 282-83. Relying principally on the Restatement of Trusts, the Court held that a “defendant who is on notice that conduct violates a fiduciary duty is chargeable with constructive knowledge of the breach if a reasonably diligent investigation would have revealed the breach.”
 
 Id.
 
 at 283. The Court
 
 *246
 
 then applied that standard to the facts presented, and concluded that:
 

 flying red flags were sending out signals that [the union president] was violating his fiduciary responsibilities in not ensuring that the funds sought contributions on behalf of the Polish workers. Accordingly, [Trump-Equitable] was on notice that [the union president] was breaching his fiduciary duties; a reasonable investigation was therefore required. Although the extent of the duty of inquiry may not be the same in all circumstances, there is no doubt that here even a cursory investigation would have uncovered [the union president’s] breach. This imparts sufficient knowledge as to the Trump defendants.
 

 Id.
 

 The
 
 Diduck
 
 rule of constructive knowledge does not apply here because that rule was established under ERISA and federal common law, not under New York common law. Moreover, the Supreme Court has since cast doubt on the underlying holding of
 
 Diduck,
 
 by suggesting that there may be no right of action under ERISA against one who aids or abets a fiduciary’s breach of duty.
 
 Mertens v. Hewitt Assocs.,
 
 508 U.S. 248, 252-53 & n. 5, 113 S.Ct. 2063, 2066-67 & n. 5, 124 L.Ed.2d 161 (1993). If there is no such right, the
 
 Diduck
 
 description of the contours of that right has even less precedential force here.
 

 New York common law, which controls the analysis here, has not adopted a constructive knowledge standard for imposing aiding and abetting liability. Rather, New York courts and federal courts in this district, have required actual knowledge. In
 
 H20 Swimwear, Ltd. v. Lomas,
 
 164 A.D.2d 804, 560 N.Y.S.2d 19 (1st Dep’t 1990), the First Department held that plaintiffs claim for aiding and abetting breaches of fiduciary duty was “legally insufficient due to ambiguity in the allegations of [the defendant’s] knowledge of [the primary violator’s] wrongdoing.”
 
 Id.
 
 at 807, 21-22, 560 N.Y.S.2d 19;
 
 see also Abbott v. Herzfeld & Rubin, P.C.,
 
 202 A.D.2d 351, 351, 609 N.Y.S.2d 230, 231 (1st Dep’t 1990) (“the cause of action for breach of fiduciary duty is ambiguous in alleging that the professional defendants knew that they were participating in a breach of the promoter defendant’s fiduciary duty to plaintiffs”). To support its conclusion in
 
 H20 Swimwear,
 
 the First Department cited to
 
 AA Tube Testing Co., Inc. v. Sohne,
 
 20 AD.2d 639, 246 N.Y.S.2d 247 (2d Dep’t 1964), in which the Court held that an essential element of a claim for inducing a breach of contract (third-party liability similar to aiding and abetting), was that defendants had “actual knowledge; an allegation that they ‘should have known’ of the existence of the contract is insufficient.”
 
 Id.
 
 at 248, 246 N.Y.Süd 247;
 
 see also Burns Jackson Miller Summit & Spitzer v. Lindner,
 
 88 A.D.2d 50, 72, 452 N.Y.S.2d 80, 93 (2d Dep’t 1982) (tortious interference with a contract requires “actual knowledge on the part of the defendant of the contract’s existence.”),
 
 ajfd,
 
 59 N.Y.2d 314, 464 N.Y.S.2d 712, 451 N.E.2d 459 (1983). Together,
 
 H20 Swimwear
 
 and
 
 AA Tube Testing
 
 demonstrate that actual knowledge is required to impose liability on an aider and abettor under New York law.
 

 Similarly, courts in this district applying New York law have held that actual knowledge is necessary to impose liability for participating in a breach of fiduciary duty.
 
 See Samuel M. Feinberg Testamentary Trust v. Carter,
 
 652 F.Supp. 1066, 1082 (S.D.N.Y. 1987) (“Actual knowledge, not mere notice or unreasonable awareness, is ... essential.”);
 
 Marine Midland Bank v. Smith,
 
 482 F.Supp. 1279, 1290 (S.D.N.Y.1979) (no liability for aiding and abetting breach of fiduciary duty where defendant was “not aware of conduct which it knew to constituted a breach of duty”),
 
 ajfd,
 
 636 F.2d 1202 (2d Cir.1980). Courts in this district applying the law of other states also have required proof of actual knowledge.
 
 See In re Consolidated Welfare Fund ERISA Litig.,
 
 856 F.Supp. 837, 842 (S.D.N.Y.1994) (applying California law: “It is clear that liability for aiding and abetting a tort cannot attach absent actual knowledge of the underlying tort.”);
 
 Terrydale Liquidating Trust v. Barness,
 
 611 F.Supp. 1006, 1027 (S.D.N.Y.1984) (applying Missouri law: “liability cannot be imposed absent a showing that the defendants had actual ■knowledge of tortious conduct by the primary wrongdoer.”).
 

 
 *247
 
 The Restatement Second of Torts also has been interpreted to include a requirement of actual knowledge. It states:
 

 For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he ... knows that the other’s conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other____
 

 Restatement (Second) of Torts § 876(b) (1977). Discussing that section, the Supreme Court has explained that the Restatement, “under a concert of action principle, accepts a doctrine with rough similarity to criminal aiding and abetting.”
 
 Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A,
 
 511 U.S. 164, -, 114 S.Ct. 1439, 1450, 128 L.Ed.2d 119 (1994). Criminal aiding and abetting “makes a defendant a principal when he
 
 consciously
 
 shares in any criminal act.”
 
 Nye & Nissen v. United States,
 
 336 U.S. 613, 620, 69 S.Ct. 766, 770, 93 L.Ed. 919 (1949) (emphasis added). That means that a conviction for aiding and abetting a crime requires at least “some knowledge of the proposed crime. A general suspicion that an unlawful act may occur is not enough.”
 
 United States v. Giraldo,
 
 80 F.3d 667, 676 (2d Cir.1996) (citations omitted). It follows that the Restatement’s “roughly similar” doctrine of tortious aiding and abetting requires actual knowledge as well.
 
 See Consolidated Welfare Fund,
 
 856 F.Supp. at 842 (interpreting § 876 of the Restatement to require actual knowledge).
 

 The requirement of “actual knowledge” is consistent also with the other elements of an aiding and abetting claim. A defendant may be held liable for “participating” in another’s breach of fiduciary duty only if the defendant provided “substantial assistance” to the primary violator.
 
 DePinto v. Ashley Scott, Inc.,
 
 — A.D.2d -, 635 N.Y.S.2d 215, 217 (1st Dep’t 1995) (holding that allowing third party to use office space “does not rise to the level of ‘substantial assistance’ necessary to state a claim for aiding and abetting a breach of fiduciary duty.”). One provides substantial assistance if he “affirmatively assists, helps conceal, or by virtue of failing to act when required to do so enables it to proceed.”
 
 Diduck,
 
 974 F.2d at 284. However, inaction constitutes substantial assistance only when an “independent duty to act was a duty owed to the defrauded investor.”
 
 Dillon v. Militar no,
 
 731 F.Supp. 634, 639 (S.D.N.Y.1990);
 
 Stander v. Financial Clearing & Servs. Corp.,
 
 730 F.Supp. 1282, 1288 (S.D.N.Y.1990) (aiding and abetting a securities law violation). That is, inaction, or a failure to investigate, constitutes actionable participation only when a defendant owes a fiduciary duty directly to the plaintiff; that the primary violator owes a fiduciary duty to the plaintiff is not enough.
 
 See generally
 
 W. Page Keeton
 
 et al., Prosser & Keeton on the Law of Torts
 
 § 46 at 323-24 (5th ed. 1984) (“Since there is ordinarily no duty to take affirmative steps to interfere, mere presence at the commission of the wrong ... is not enough to charge one with responsibility.”). To hold all defendants to a standard of constructive knowledge and subject to a duty of inquiry would mean that all defendants, regardless of their independent obligations to plaintiff, could be liable for inaction. That result is contrary to the law of substantial assistance and confirms that a failure to investigate,
 
 i.e.,
 
 constructive knowledge, is not enough to support a claim for aiding and abetting a fiduciary duty absent the existence of a fiduciary duty running from defendant to plaintiff.
 

 Plaintiffs rely principally on the OSC in the Gunther action to show that defendant Refeo knew Schindler was looting plaintiffs’ funds. Because the OSC alleged that Schindler had stolen from Gunther’s Refeo account, and because that OSC initially was issued, plaintiffs urge, defendants knew of Schindler’s breach of fiduciary duty. The OSC told Refeo only that one of Schindler’s clients, who is
 
 not
 
 one of the plaintiffs here, charged Schindler with fraud. And upon further examination, the Court found that Gunther’s allegations did not warrant the preliminary relief requested, and accordingly vacated the OSC and denied the request for an attachment of Schindler’s assets. Once the court made that determination, defendants were not obligated to undertake their own investigation into Schindler’s use of the funds withdrawn from Refco’s accounts.
 

 Plaintiffs minimize the significance of the court’s vacatur of the OSC by saying that it
 
 *248
 
 “merely ended the prejudgment attachment and did not dispose of any of the allegations raised in [the OSC].” (Pl.Reply Mem. at 3) Plaintiffs fail to recognize that once the Court vacated the OSC, the allegations contained therein were only allegations, not yet proved true or false in a competent forum. Defendants cannot be charged with knowledge of Schindler’s misconduct simply because they had knowledge of accusations against him, without more.
 

 Plaintiffs allege that LIT knew of Schindler’s fraud as of March 4, 1993 when LIT was served with plaintiffs’ demands to stop trading and liquidate their accounts. But again, those demands amounted to nothing more than unproved allegations, insufficient to establish knowledge. LIT owed a statutory duty to its clients — Christian Schindler and FIC — to honor their requests with respect to their accounts. 7 U.S.C. § 6d(2) (1994) (requiring an FCM to “treat and deal with all money ... received by it to margin, guarantee, or secure the trades or contracts of any customer ... as belonging to such customer);
 
 see also Kolbeck,
 
 923 F.Supp. at 571 (noting that LIT had no authority to liquidate Schindler’s account absent instructions from Schindler). LIT had no corresponding duty to non-clients, including plaintiffs.
 

 The other parts of plaintiffs’ voluminous factual'submission are equally deficient, and in fact cut against plaintiffs’ claim of knowledge. Plaintiffs point to the deposition testimony of defendant Leonard Alpert, which reveals that when asked whether he was aware about the Gunther lawsuit, Alpert said, “No,” (Alpert Dep. at 114), and when asked “were there any other sources that led you to believe that FIC was involved in investing and trading customer funds?” Alpert again said “No.”
 
 (Id.
 
 at 115) Lawrence Rose’s deposition testimony discloses that when Rose asked Schindler about the wire transfers out of the Refco account, Schindler said something “along the lines of ... ‘It is my Goddamned money.’” (Rose Dep. at 134)
 

 The testimony of plaintiff Thilo Lipkow is slightly more incriminating, but still not enough to demonstrate defendants’ knowledge of Schindler’s breach of duty. Lipkow stated that when he met with Schindler and Alpert at Refco’s offices,
 
 see supra
 
 p. 4, although Schindler did not mention that Lipkow was a customer of FIC, “Alpert knew that [Lipkow] had already made an investment,” because Lipkow “mentioned the fact that [he] had already invested---- [Alpert] could presume that [Lipkow] had invested.” (Lipkow Dep. at 69) But even if Alpert knew that Schindler was trading on Lipkow’s behalf,
 
 i.e.,
 
 that Schindler owed Lipkow a fiduciary duty, that testimony imputes to Alpert no knowledge of Schindler’s breach of that duty.
 

 Plaintiffs’ factual allegations would fall short even if the
 
 Diduck
 
 rule applied here. In
 
 Diduck,
 
 the Trump-Equitable representative assumed
 
 all
 
 financial aspects of the job, knew that there were non-union workers on the job, and knew also that those workers “were being paid under the table for work covered by the collective bargaining agreement.”
 
 Diduck,
 
 974 F.2d at 283. Thus, because the Trump-Equitable representative had actual knowledge of most of the critical facts, only the most “cursory” investigation would have clinched his knowledge of the fiduciary’s breach.
 
 Id.
 
 Here, plaintiffs have not alleged facts to show that defendants had actual knowledge of any part of Schindler’s larceny, and indeed a much more than cursory investigation would have been necessary to uncover Schindler’s misconduct. Accordingly, even the variety of constructive knowledge alleged in
 
 Diduck
 
 is not alleged here.
 

 Because plaintiffs have failed to set forth facts showing that defendants knew Schindler was stealing plaintiffs’ money, plaintiffs’ motion to amend their complaint to allege a claim of participating in that breach of fiduciary duty must be denied.
 

 IV.
 

 Plaintiffs’ proffered complaint alleges also that Schindler breached a fiduciary duty to them by failing to diselose the material risk of dealing with a non-registered entity, and that defendants participated in that breach by failing to investigate Schindler’s registration status and the source of his
 
 *249
 
 funds. (Compl. ¶¶43, 47) Even assuming,
 
 arguendo,
 
 that defendants had actual knowledge of Schindler’s lack of registration, plaintiffs’ claim on this basis must be dismissed because Schindler’s failure to register did not cause their losses.
 

 Aiding and abetting liability arises only when plaintiffs’ injury was “a direct or reasonably foreseeable result” of the eomplained-of conduct.
 
 Morin v. Trupin,
 
 711 F.Supp. 97, 112 (S.D.N.Y.1989). “But-for” causation does not suffice; the breach must proximately cause the loss.
 
 Northwestern Nat’l Ins. Co. v. Alberts,
 
 769 F.Supp. 498, 505 (S.D.N.Y.1991);
 
 Ram Investment Assocs. v. Citizens Fidelity Bank & Trust Co.,
 
 No. 91 Civ. 3617, 1992 WL 240581, *5 (S.D.N.Y. Sept. 16, 1992) (dismissing aiding and abetting fiduciary duty claim because of failure to establish proximate cause).
 

 Schindler’s failure to register, and defendants’ failure to investigate that lapse, had little if anything to do with plaintiffs’ losses. Plaintiffs’ theory of causation appears to be that if defendants had investigated Schindler’s status and learned that he was not registered, defendants would have ceased doing business with Schindler, or would have required him to register with the CFTC. It follows, plaintiffs urge, that either course of conduct would have prevented plaintiffs’ losses. That chain of causation, however, is far too long to constitute proximate cause. Accordingly, plaintiffs’ motion to amend to allege a claim of participating in Schindler’s failure to register must be denied.
 

 Because the proposed amended complaint would not withstand a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), plaintiffs’ motion to amend is denied.
 

 SO ORDERED.